# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 8, 2010

No. 09-50692

Lyle W. Cayce
Clerk

INTERNATIONAL WOMEN'S DAY MARCH PLANNING COMMITTEE, an unincorporated association; SAN ANTONIO FREE SPEECH COALITION, an unincorporated association,

Plaintiffs-Appellants

v.

CITY OF SAN ANTONIO, PHIL HARDBERGER, in his Official Capacity as Mayor of the City of San Antonio; SHERYL L. SCULLEY, in her Official Capacity as City Manager of the City of San Antonio; WILLIAM P. MCMANUS, in his Official Capacity as Chief of Police of the City of San Antonio; THE TEN INDIVIDUAL COUNCIL MEMBERS,

Defendants-Appellees

Appeal from the United States District Court for the
Western District of Texas (San Antonio Division)

Before BENAVIDES, STEWART, and SOUTHWICK, Circuit Judges.
FORTUNATO P. BENAVIDES, Circuit Judge:

The City of San Antonio imposes fees on the organizers of marches on its streets, as a means of ensuring that march organizers pay for the expense of providing traffic control and cleanup for these events. *See* San Antonio, Tex., Code ch. 19, art. XVII, § 19-636(b) (2010). The plaintiffs in this case, the International Women's Day March Planning Committee ("Committee") and the

No. 09-50692

San Antonio Free Speech Coalition ("Coalition"), assert that the assessment of these fees violates the First Amendment in several respects. San Antonio selectively exempts certain events from payment of these fees, and the plaintiffs challenge these exemptions on a number of grounds. Also, the plaintiffs assert that San Antonio does not sufficiently constrain the authority of its police department to determine the amount of these fees. They further protest that San Antonio lacks adequate venues for expression unburdened by fees. Finding these claims without support, at least on the basis of the record before us, we affirm the district court's grant of summary judgment in favor of San Antonio.

I.

On November 29, 2007, San Antonio repealed the ordinance that had regulated processions and similar activities on its streets since 1988,[1] *see* San Antonio, Tex., Ordinance 66526 (Feb. 4, 1988) (the "1988 ordinance"), and replaced it with a new procession ordinance. *See* San Antonio, Tex., Ordinance 2007-11-29-1193 (Nov. 29, 2007) (the "2007 ordinance"). Shortly thereafter, the plaintiffs filed the present lawsuit against San Antonio under 42 U.S.C. § 1983, challenging the 2007 ordinance's constitutionality. The Coalition is a group of organizations and individuals who periodically hold street marches in San Antonio concerning various political issues. Its co-plaintiff, the Committee, organizes the annual International Women's Day March in San Antonio, the purpose of which is to express solidarity with all women and to educate participants and the general public about issues affecting women in San Antonio and around the world. In their complaint, the plaintiffs asserted that the 2007

---

[1] After its initial passage, the City Council amended the 1988 ordinance several times. *See* San Antonio, Tex., Ordinance 101404 (Sept. 15, 2005); San Antonio, Tex., Ordinance 86615 (Sept. 11, 1997); San Antonio, Tex., Ordinance 66526 (July 7, 1988).

ordinance violated their right to freedom of speech under the U.S. Constitution.[2] As such, they asked the district court to permanently enjoin enforcement of the 2007 ordinance.  Additionally, since the Committee was planning to hold its annual parade on March 8, 2008, the plaintiffs also sought a preliminary injunction barring enforcement while this case was pending.  Later, the plaintiffs also amended their complaint to add claims challenging San Antonio's interpretation and application of its repealed 1988 ordinance.

Several months after the plaintiffs filed this lawsuit, on February 21, 2008, the district court issued a preliminary injunction, as it found that there was a substantial likelihood that certain aspects of the 2007 ordinance were unconstitutional.  First, relying on the Supreme Court's decision in *Forsyth County v. Nationalist Movement*, the district court expressed concern that the 2007 ordinance granted the San Antonio Police Department ("SAPD") excessive discretion in assessing fees to permit applicants to recoup traffic control expenses.  505 U.S. 123, 130 (1992).  Specifically, the court found excessive discretion because the SAPD had no internal written policy guiding its decisionmaking.  The court was also troubled that the appeals process established for the permit scheme did not clearly authorize challenges to the amount of fees imposed by the SAPD.  Second, following *Forsyth County*'s holding that "[s]peech cannot be financially burdened . . . simply because it might offend a hostile mob," *id*. at 134-35, the court disapproved of language in the 2007 ordinance suggesting that procession organizers could be charged for the cost of providing for "the safety of the event participants and the general public."  Ordinance 2007-11-29-1193, § 3, § 19-636(B).  Third, following our decision in *Knowles v. City of Waco*, the court held that the 2007 ordinance's exemption of funeral processions and government agencies from its permit

---

[2] *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . .").

scheme was improper, as it called into question whether the permit scheme was narrowly tailored to meet its purported goal of promoting traffic safety. 462 F.3d 430, 436-37 (5th Cir. 2006).

Although the district court thought it likely that the plaintiffs would prevail on these claims, it also rejected many of the plaintiffs' other challenges to the 2007 ordinance. For example, the court rejected the plaintiffs' argument that the ordinance's waiver of fees for certain events demonstrated that the City was impermissibly engaging in viewpoint or content discrimination. However, the district court enjoined San Antonio from enforcing the unconstitutional aspects of the 2007 ordinance, thereby forbidding the City from assessing fees to permit holders for traffic control and cleanup costs.[3]

Subsequently, on March 8, 2008, while the injunction was in place, the Committee held the International Women's Day March in downtown San Antonio. Five days later, on March 13, the San Antonio City Council amended the procession ordinance, making several changes addressing the district court's concerns. *See* San Antonio, Tex., Ordinance 2008-03-13-0201 (Mar. 13, 2008) (the "2008 ordinance"). The permit scheme was amended to (i) describe in greater detail how the SAPD should determine the number of traffic control personnel and devices needed for a procession, *see id.* § 1, § 19-630(12), § 19-636(C), (ii) create an appeals process to allow permit holders to challenge the fees assessed for their procession, *see id.* § 1, § 19-636(C), (iii) provide that "[a]ny additional costs for police personnel deemed necessary to provide security due to the nature of the event will not be assessed to the permit holder," *see id.*, (iv) bring funeral processions and the activities of government agencies under the

---

[3] In its order, the district court noted that its injunction would burden the City by requiring it to subsidize "the costs of marches and parades that take place during the time between the issuance of this Order and a finding that the City has corrected the constitutional defects noted herein."

4

ordinance, *see id.* § 1, § 19-632, and (v) require the chief of police to develop a "written Standard Operating Procedure for issuance of permits and assessments of traffic control costs." *See id.* § 1, § 19-636(C). Approximately three months later, on June 18, the SAPD released Procedure 214, a thirteen-page document providing additional guidance to officers regarding San Antonio's permit scheme. *See* San Antonio Police Dep't, Standard Operating Procedure No. 214, Processions (Parades, Runs, Walks and Cycling Events) (2008).

Several days later, the City filed a motion seeking to lift the preliminary injunction. The plaintiffs then filed an amended complaint, challenging the 2008 ordinance, and the City countered by filing a motion seeking summary judgment on all claims raised by the plaintiffs. Eventually, on March 31, 2009, the district court lifted the preliminary injunction, having concluded that the City Council's 2008 amendments had addressed its concerns with San Antonio's permit scheme for processions. Finally, three months later, the court granted summary judgment for the City in a brief order, again suggesting that the City's amendments had cured any constitutional infirmities the 2008 ordinance may once have had. The plaintiffs now appeal the grant of summary judgment in favor of San Antonio.

II.

Before proceeding further, it is necessary to review the contours of San Antonio's current permit scheme for processions. *See* Ch. 19, art. XVII. The 2008 ordinance mandates that "[n]o person shall organize any procession without having first obtained a procession permit," *id.* § 19-631, and defines a "procession" as being "a group of persons moving along, by whatever means, in an orderly, formal manner on any street, alley, or public thoroughfare from a point of origin to a point of termination." *Id.* § 19-630.[4] Individuals can obtain

---

[4] The 2008 procession ordinance also defines "procession" to include a group of persons moving through the city from one point to another "in such a way as to impede the normal flow

No. 09-50692

permits by submitting an application describing the planned event and an application fee of $75 to the SAPD. *Id*. § 19-633(a), (e), (f).[5]

In addition to paying the application fee, after a permitted event, permit holders must reimburse the City for the cost of "[c]leaning up the procession route" and the cost of any "personnel" and "devices" needed to control traffic during the procession. *Id*. § 19-636(b). Before each procession, the SAPD approves a traffic control plan and determines "the number of peace officers and traffic control devices reasonably necessary to control traffic in the area of the requested procession," based on a variety of factors listed in the 2008 ordinance and Procedure 214. *Id*. § 19-636(c); Procedure No. 214 at 4-5. When relevant, we will describe these factors in greater detail below. After each procession, permit holders receive an invoice within fifteen days of their procession, and payment must be made during the thirty days following their procession. Ch. 19, art. XVII, § 19-636(c).[6]

Another relevant feature of the 2008 ordinance is that it provides for the subsidization of certain processions, effectively waiving part or all of the traffic control expenses the City would otherwise expect procession organizers to reimburse. These subsidization provisions originated in the 2007 ordinance and

---

or regulation of pedestrian or vehicular traffic." Ch. 19, art. XVII, § 19-630. The 2008 ordinance excludes from the permit scheme sidewalk processions "so long as the movement [of persons] does not impede the normal flow or regulation of pedestrian or vehicular traffic" and also "[a] public assemblage that does not involve the movement of persons in an orderly, formal manner from a point of origin to a point of termination." *Id*. § 19-632. In other words, procession permits are not required for sidewalk marches involving limited numbers of people and are also not required for stationary assemblies.

[5] If permit applicants cannot immediately pay this fee, they may submit an affidavit with their application promising to pay the fee within fifteen business days of submitting their application. Ch. 19, art. XVII, § 19-633(f).

[6] As discussed above, the permit scheme now has an appeals process allowing permit holders to challenge the amount of the fees assessed to them. Permit holders may file an appeal with San Antonio's city manager within seven days of receiving an invoice, with no fees due while the appeal is pending. Ch. 19, art. XVII, § 19-636(c).

6

No. 09-50692

the City Council's 2008 amendments did not affect them. First, San Antonio provides special treatment for "First Amendment processions," which have as their "sole or principal object . . . expressive and associative activity that is protected by the United States and Texas Constitutions, including speech, press, assembly, and the right to petition, but not including commercial advertising." *Id*. § 19-630. For such processions, San Antonio absorbs the first $3,000 of expenses for traffic control personnel and devices, leaving the permit applicant only responsible for traffic control expenses over $3,000 and any cleanup expenses. *Id*. § 19-636(c). In this case, it is undisputed that the International Women's Day March qualifies as a First Amendment procession and therefore would be eligible for the City's $3,000 subsidy.[7]

Second, the 2008 ordinance also provides special fee waivers for three annual events, the Diez Y Seis Parade, the Martin Luther King March, and the Veterans Day Parade. Specifically, the ordinance explains that:

> Because of its broad appeal, historic tradition, cultural significance, and other public benefits provided by the Deiz Y Seis Parade, the city shall cover the costs of traffic control personnel. Because of their broad appeal, historic tradition, cultural significance, association with a national holiday or a day given statewide recognition, and other public benefits provided by the Martin Luther King March and the Veterans Day Parade, the city shall cover the costs of traffic control personnel and traffic control devices.

*Id*. § 19-636(d). Beyond these three events, the City also provides fee waivers for several other events, which will be described in greater detail below.

III.

---

[7] We note that in the district court, the plaintiffs challenged the definition of First Amendment processions on vagueness and overbreadth grounds. They have not chosen to pursue this claim on appeal, and thus we do not address the propriety of the City's definition of First Amendment processions or the propriety of excluding certain processions from receiving this designation.

No. 09-50692

With this background complete, we now address some preliminary matters that will help structure our analysis. First, we describe the standards governing our review of the district court's grant of summary judgment and explain the First Amendment principles relevant for this case. Second, we briefly outline the plaintiffs' claims, assess whether these claims are facial or as-applied, and determine what evidence is properly before us on this appeal.

A.

As noted above, the plaintiffs appeal from the district court's grant of summary judgment in favor of San Antonio. We review a grant of summary judgment "de novo, applying the same legal standards as the district court." *Knowles*, 462 F.3d at 434. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We construe all facts and inferences in the light most favorable to the nonmoving party when reviewing grants of motions for summary judgment." *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005).

Events like the International Women's Day Parade are forms of expression protected under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (explaining that "[n]ot many marches . . . are beyond the realm of [protected] expressive parades"). As such, San Antonio bears the burden of demonstrating that its regulation of this expressive activity is constitutionally permissible. *See Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992). That said, defending the constitutionality of fees like those at issue in this case is not always an impossible task. The Supreme Court has long recognized that when groups hold events on public property, municipalities may impose fees as part of a permit scheme controlling this activity, *see Cox v. New Hampshire*, 312 U.S. 569, 577

8

(1941) (approving of license fee imposed on parade organizers for purpose of "meet[ing] the expense incident to the administration of the [licensing scheme] and to the maintenance of public order in the matter licensed"), as long as these fees "meet certain constitutional requirements." *Forsyth County*, 505 U.S. at 130. We now explain these requirements.

Permit schemes that allow licensors to censor speech on the basis of its content are prior restraints on speech, against which there is a heavy presumption of invalidity. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320-21 (2002); *Forsyth County*, 505 U.S. at 130-33. A permit scheme's restrictions "based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, and restrictions based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009) (internal citation removed). Given this aversion to content discrimination, permit schemes may not vest government officials with overly broad discretion in assessing fees, because "government regulation that allows arbitrary application . . . 'has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County*, 505 U.S. at 130 (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)); *see also Thomas*, 534 U.S. at 323 ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."). However, a permit scheme "controlling the time, place, and manner of speech" is permissible, as long as it is not "based on the content of the message," is "narrowly tailored to serve a significant governmental interest," and "leave[s] open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

B.

No. 09-50692

The plaintiffs assert that the fees imposed by San Antonio do not satisfy these constitutional requirements, essentially raising four claims. First, they argue that San Antonio's payment of traffic control expenses for certain processions establishes that the City is engaging in impermissible content or viewpoint-based discrimination in assessing fees.[8] Second, they contend that the City Council and the SAPD have excessive discretion in assessing fees, allowing them to impose fees based on the content of permit applicants' speech. Third, they argue that the fee exemptions granted certain groups reveal that the fees imposed by San Antonio are not narrowly tailored to meeting the City's stated goal of recouping traffic control expenses. Fourth, they claim that San Antonio's levy of fees on permit applicants is impermissible because the City lacks other alternate venues open for unburdened expression.[9]

Before assessing these claims, we now address several interrelated issues concerning the scope of this appeal and the evidence before us. First, we find that the plaintiffs may only bring a facial challenge to the 2008 ordinance. In

---

[8] The plaintiffs also assert that San Antonio's selective waiver of fees violates the Equal Protection Clause of the Constitution. *See* U.S. Const. amend. XIV ("No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."). However, the plaintiffs have not argued this claim in any way that is distinct from their general viewpoint discrimination claim. As such, this claim is subsumed within our analysis of content and viewpoint discrimination.

[9] The parties also dispute whether the fees imposed by San Antonio qualify as a prior restraint on speech. San Antonio notes that under the 2008 ordinance, procession organizers need not pay any traffic control fees until *after* an event has taken place. *See* Ch. 19, art. XVII, § 19-636(c). Consequently, they suggest these fees cannot be a *prior* restraint. We find that it matters little for our analysis that the plaintiffs only need to pay traffic control fees after their processions are complete. The Third Circuit recently struck down an ordinance that vested excessive discretion in a licensor to determine fees for police and cleanup costs, despite the fact that payment was not due until after the event. *Nationalist Movement v. City of York*, 481 F.3d 178, 181, 186 (3d Cir. 2007). The court reasoned that contingent payment after an event would be "even more offensive to the First Amendment than" fixed payments before an event, since an event organizer "would have no way of knowing the scope of the liability to which it might be subjecting itself." *Id.* at 186. We agree with the Third Circuit and find that San Antonio's fees cannot escape scrutiny simply because they are imposed after a procession.

No. 09-50692

particular, we conclude that the plaintiffs cannot pursue an as-applied challenge against the informal waivers of traffic control fees that the SAPD granted to many processions under the repealed 1988 ordinance. Second, we determine the number of processions for which San Antonio waives fees under the 2008 ordinance. The plaintiffs have argued that San Antonio interprets the 2008 ordinance to allow for more fee waivers than it explicitly lists.

We address these issues preliminarily, as they are important for a number of the plaintiffs' claims. For example, the number of fee waivers granted by San Antonio is relevant for our analysis of viewpoint discrimination. Similarly, before assessing the plaintiffs' claims regarding the discretion held by the City Council and the SAPD, we must determine whether San Antonio's practices under the repealed 1988 ordinance are before us on this appeal.

i.

We now assess whether the plaintiffs' claims are facial or also as-applied. To prevail on a facial challenge, a plaintiff must establish that "no set of circumstances exists under which [the challenged law] would be valid," *see United States v. Salerno*, 481 U.S. 739, 745 (1987), or at least that the challenged law does not have any "'plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-740 & n.7 (1997) (Stevens, J., concurring)).[10]

We find that the plaintiffs may only bring a facial challenge to the 2008 ordinance on this appeal, as they never clearly raised an as-applied challenge to the 2008 ordinance in the district court. "If a party wishes to preserve an

---

[10] In the First Amendment context, the Supreme Court has applied a more flexible standard for facial challenges when a plaintiff challenges a law as being unconstitutionally overbroad. For overbreadth claims, a facial challenge may succeed when "a 'substantial number' of [a law's] applications are unconstitutional, 'judged in relation to the [law's] plainly legitimate sweep.'" *See Wash. State Grange*, 552 U.S. at 449 n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)). In this case, the plaintiffs have not asserted on appeal that any of their claims fall under the overbreadth doctrine.

argument for appeal, the party 'must press and not merely intimate the argument during the proceedings before the district court.'" *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 340 (5th Cir. 2005) (quoting *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 n. 4 (5th Cir. 1996)).  The record is replete with references to a facial challenge, but is bare of any explicit reference to an as-applied challenge to the 2007 or 2008 versions of the current procession ordinance.[11]

We also reject any as-applied challenge to the repealed 1988 ordinance. As noted above, in their complaint, the plaintiffs seek relief from San Antonio's "application" of the 1988 ordinance.  Also, during this litigation, the plaintiffs have asserted that the informal fee assessment "policies" of San Antonio are unconstitutional, relying on evidence concerning the enforcement of the 1988 ordinance.  In particular, it appears that under the 1988 ordinance, individual members of the San Antonio City Council sometimes intervened with the SAPD

---

[11] Repeatedly, plaintiffs' claims were characterized as being facial during the proceedings below, without protest from the plaintiffs.  In the district court's order enjoining the enforcement of portions of the 2007 ordinance, the court characterized the plaintiffs' claims as being facial.  Subsequently, in San Antonio's motion for summary judgment, the City stated, "The Plaintiffs in this case raise facial constitutional challenges to the March Ordinance."  In response, in the plaintiffs' motion opposing summary judgment, they never explicitly stated that they were asserting any as-applied claims; instead, they stated that "even in a facial challenge to the new ordinance," courts must consider San Antonio's "authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth County*, 505 U.S. at 131.  This pattern repeated when the City and the plaintiffs filed proposed conclusions of law with the district court.  In the plaintiffs' proposed conclusions of law, they argued that they had "standing to bring a facial challenge" and made other arguments concerning facial claims, but made no mention of as-applied claims.  Later, in a hearing before the district court on January 15, 2009, the plaintiffs again did not counter the City's characterization of their claims as being facial.  Counsel for San Antonio questioned the relevance of certain evidence for the plaintiffs' case, stating that, "As I understand this case, it is a facial challenge to the ordinance."  In response, counsel for the plaintiffs again did not assert that they were bringing any as-applied claims, but rather explained that "in order to rule on the facial challenge, we need to look at" San Antonio's "interpretations" of its ordinance.

to obtain informal fee waivers for particular processions, without obtaining formal city sponsorship of these processions or passing ordinances granting such waivers.  For example, deposition testimony indicates that in 2005, the SAPD waived traffic control fees for thirty-two of the forty-two processions worked by the police.  Based on evidence like this, the plaintiffs challenge not only the 2008 ordinance, but also San Antonio's informal fee waiver policies under the 1988 ordinance.

We fail to see how a challenge to the enforcement of the 1988 ordinance presents a live controversy, given the ordinance's repeal.  "Suits regarding the constitutionality of statutes become moot once the statute is repealed." *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004).  Furthermore, San Antonio does not interpret the 2008 ordinance to authorize the practices carried out under the 1988 ordinance,[12] and on this facial challenge to the 2008 ordinance, we must consider the City's "authoritative constructions" and "interpretations" of its ordinance.  *Forsyth County*, 505 U.S. at 131.  The First Circuit has observed that "it would be pointless . . . to enjoin the enforcement of a [policy] that is no longer in effect."  *See New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002).  Given these considerations, we conclude that any as-applied challenge to the enforcement of the repealed 1988 ordinance is moot.  As such, the only claim before us on this appeal is a facial challenge to San Antonio's 2008 ordinance.[13]

---

[12] During a hearing before the district court on December 20, 2007, counsel for San Antonio explained that the "door [for informal waivers] has been basically closed [under the new ordinance,] because there is no longer that discretion of a group calling up the Council, their Council representative and saying: I would like waiver of this or that."

[13] Although not raised by the parties, we find that the plaintiffs have standing to bring their facial challenge to the procession ordinance.  "Chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."  *Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007).  Even when an injunction has blocked the enforcement of an ordinance against particular plaintiffs, we have found that

No. 09-50692

ii.

Having established that the only claims properly before us are facial, we now review the evidence before us concerning the number of processions that San Antonio exempts from fees under the 2008 ordinance. As already noted, when evaluating a facial challenge to an ordinance, we must consider a municipality's "authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth County*, 505 U.S. at 131. Thus, if there is evidence that San Antonio provides fee waivers for more processions than are explicitly listed in the 2008 ordinance, we may consider these exemptions in our analysis.

It is clear that San Antonio provides fee waivers for more events than the 2008 ordinance lists. As explained above, the 2008 ordinance explicitly establishes fee waivers for the Diez Y Seis Parade, the Martin Luther King March, and the Veterans Day Parade. *See* Ch. 19, art. XVII, § 19-636(d). Beyond these events, it is also clear that San Antonio provides fee waivers for

---

such plaintiffs have standing to challenge the enjoined ordinance, so long as they demonstrate that they engage in activity that is regulated by the challenged ordinance. *Id.* at 618-19. In this case, the district court's injunction prevented the City from completely enforcing the 2007 version of the current ordinance against the Committee. However, it is clear that the Committee engages in activity regulated by the ordinance. After the district court enjoined San Antonio from assessing traffic control and cleanup fees, the Committee did in fact proceed with the International Women's Day March. *Cf. id.* at 618 (finding standing when "following entry of . . . injunction," plaintiff engaged in activity proscribed by enjoined ordinance).

Furthermore, we find that the plaintiffs have standing to challenge the fee exemptions provided to third parties by San Antonio. In similar circumstances, the Supreme Court has found that plaintiffs adversely affected by a law have standing to challenge exemptions granted to others similarly situated. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227 (1987). This conclusion is not inconsistent with our recent decision in *SEIU v. City of Houston*, 595 F.3d 588 (5th Cir. 2010). In *SEIU*, we concluded that a plaintiff did not have standing to raise a content discrimination claim against a municipal sound ordinance that granted exemptions to certain activities, such as "historical re-enactments, construction noises, noises from parks and school grounds, and church bells." *Id.* at 598. However, importantly, in *SEIU*, the plaintiff had not argued that these exemptions "interfered with its planned activities." *Id.* at 597. In contrast, in this case, the fees that San Antonio imposes on the plaintiffs, allegedly on a discriminatory basis, clearly interfere with their processions. The plaintiffs have standing to challenge this alleged discrimination.

14

the annual Cesar Chavez Parade and processions related to the annual Fiesta San Antonio celebration. Separate city ordinances grant financial support to these events,[14] and the record shows that when the City Council adopted the current procession ordinance, the Council did not intend to disturb its preexisting support for these events.[15] Additionally, in proceedings before the district court, counsel for San Antonio suggested that the City also waives fees for the annual 60+ Mardi Gras Parade, which is a city-sponsored event.[16]

In their briefing, however, the plaintiffs allege that the City also supports other processions under the 2008 ordinance, such as the annual Juneteenth Celebration and the San Fernando Easter Procession. As proof, they cite to various documents in the record. First, the record contains a March 2007 staff presentation to the City Council that suggests planned fee waivers for the San Fernando Easter Procession and the San Antonio Marathon, among other events. This presentation is not helpful, however, as it does not reveal the current scope of exemptions under the 2008 ordinance. When San Antonio was considering repealing the 1988 ordinance, early drafts of its replacement contained fee waivers not present in the 2008 ordinance.

Second, the plaintiffs also cite to spreadsheets showing the fees paid to San Antonio for traffic control personnel expenses from 2003 to April 2008. Most of the information contained in these documents is not helpful for this appeal,

---

[14] *See, e.g.*, San Antonio, Tex., Ordinance 90421, § 6 (Sept. 2, 1999) ("Funding for an annual Cesar Chavez Parade will be identified during the annual budget process each year.").

[15] At the City Council's November 29, 2007 meeting, the Council reviewed a PowerPoint presentation that explained that "[o]ther ordinances already provide that the city will cover the costs associated with . . . Fiesta Parades and related events [and the] Cesar Chavez March."

[16] During the December 20, 2007 hearing, counsel explained that the 60+ Mardi Gras Parade is sponsored by the City and therefore argued that "to pay fees [for the 60+ Mardi Gras Parade] would be essentially taking money from one pocket of the City and placing it in the other pocket of the City."

No. 09-50692

as it concerns the City's practices under the 1988 ordinance or during the period when the district court's preliminary injunction interfered with the collection of fees under the 2007 and 2008 versions of the current ordinance.[17]  That said, these documents do contain information regarding the enforcement of the current ordinance from December 9, 2007, the date it became effective, *see* Ordinance 2007-11-29-1193, § 8, to February 21, 2008, the date the district court entered its injunction.  This evidence, however, is also not helpful for the plaintiffs, as it does not reveal that the SAPD granted any fee waivers beyond those explicitly authorized in the 2007 and 2008 versions of the procession ordinance.[18]  Thus, the record shows that San Antonio provides fee waivers for more processions than are explicitly listed in the 2008 procession ordinance, but not as many processions as the plaintiffs allege.

IV.

With these preliminary matters finally behind us, we now address whether San Antonio engages in content or viewpoint-based discrimination in waiving traffic control fees for a limited number of processions.  As noted above, content-based burdens on speech in a public forum are subject to strict scrutiny, while viewpoint-based burdens are unconstitutional.  *Summum*, 129 S. Ct. at 1132.

---

[17] As noted above, when the City Council amended the 2007 ordinance on March 8, 2008, the Council changed none of the provisions waiving fees for various events.  Thus, the 2007 and 2008 ordinances are identical in this respect.

[18] Between December 9, 2007 and February 21, 2008, three processions occurred for which San Antonio received no fee payment.  However, the spreadsheets make clear that the SAPD did not waive fees for any new processions during this period.  First, La Gran Posada San Fernando occurred on December 16, 2007.  There is "no record of payment" for this procession, but the spreadsheet confirms that the SAPD sent the procession organizers a bill for $1,070 on December 27, 2007.  The failure of a procession organizer to pay a bill is not evidence of a fee waiver.  Second, the Rodeo Run occurred on January 2, 2008.  The SAPD received no fee payment for this procession, but the spreadsheet also notes that the SAPD did not provide any traffic control personnel for it.  Third, the Martin Luther King March occurred on January 21, 2008.  The SAPD received no fee payment for this event, but the 2007 and 2008 versions of the current ordinance waives these fees.

No. 09-50692

The plaintiffs assert that San Antonio is impermissibly imposing viewpoint-based financial burdens on expression in a public forum, as the City waives otherwise applicable traffic control fees for certain events because of their "broad appeal, historic tradition, cultural significance, and [provision of] other public benefits." Ch. 19, art. XVII, § 19-636(d). In other words, if the Committee were not organizing the International Women's Day March, but rather helping to organize the Martin Luther King March, the City would not charge them for the cost of personnel and devices used to control traffic during their procession.

In response to the plaintiffs, San Antonio defends its waivers by claiming that its financial support for particular events constitutes government speech, which "is exempt from First Amendment scrutiny." *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). In the alternative, San Antonio argues that it is not engaging in viewpoint discrimination, in that its provision of support for certain events does not establish that the City imposes fees on the plaintiffs because of a disagreement with their message. It also cites to Supreme Court precedent suggesting that it may selectively subsidize some private speech of its choice, as long as it does not engage in viewpoint discrimination. *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 548-49 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny."). Although San Antonio has not shown that its financial support for certain events is government speech, we believe the City may selectively subsidize some processions and not others, as we conclude that it is not engaging in viewpoint discrimination.

A.

As an initial matter, we conclude that San Antonio has not established that its financial support for events like the Martin Luther King March and Cesar Chavez Parade constitutes government speech. The Supreme Court has

17

held that ostensibly private speech can qualify as government speech "[w]hen the government disburses public funds to private entities to convey a governmental message" and "take[s] steps to ensure that its message is neither garbled nor distorted by the" private speaker. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). As such, for private speech to become the government's own, the government must exercise a high degree of control over speech, "'effectively controll[ing]'" a message by "exercising 'final approval authority' over [its] selection." *Summum*, 129 S. Ct. at 1134 (quoting *Johanns*, 544 U.S. at 560-61). Thus, in *Johanns v. Livestock Marketing Ass'n*, the Supreme Court found that advertisements encouraging beef consumption could be classified as government speech, as the federal government had "set[] the overall message to be communicated and approve[d] every word that [was] disseminated." 544 U.S. at 562. Similarly, in *Chiras v. Miller*, we held that the Texas State Board of Education's selection of certain science textbooks on the basis of its "editorial judgment" constituted government speech. 432 F.3d 606, 615 (5th Cir. 2005). And more recently, in *Pleasant Grove City v. Summum*, the Supreme Court held that a local government's selection of certain permanent monuments for placement on public land constituted government speech, noting that "[a]cross the country, 'municipalities generally exercise editorial control over donated monuments through prior submission requirements, design input, requested modifications, written criteria, and legislative approvals of specific content proposals.'" 129 S. Ct. at 1133 (citation omitted).

Assuming *arguendo* that processions could in some circumstances qualify as government speech, we conclude that San Antonio has not demonstrated that its procession sponsorship is government speech. The City has made no showing that it exercises any control over the messages conveyed at its sponsored events, other than endorsing the general message of each event through its provision of financial support. Unlike the textbooks and monuments discussed above, San

No. 09-50692

Antonio cannot inspect all the messages conveyed at a procession before it makes its sponsorship decision. *Cf. Hurley*, 515 U.S. at 569 (noting many "multifarious" messages conveyed at Boston St. Patrick's Day Parade). In such circumstances, for sponsorship of a procession to qualify as government speech, a municipality must, at the *very* least, make some bare showing of organizational or planning involvement in a procession. San Antonio has not made any.[19] Consequently, the City's financial support for certain processions is not government speech exempt from First Amendment scrutiny, at least not on the basis of the record before us.

B.

However, even if San Antonio's financial support for certain processions does not qualify as government speech, this does not mean that it is impermissible. In a number of cases, the Supreme Court has suggested that as long as the government does not engage in viewpoint discrimination, it may freely subsidize private speech of its choice, while not subsidizing other private speech. *See Regan*, 461 U.S. at 549 ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny."); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (suggesting that viewpoint discrimination is improper when purpose of government subsidization is "to facilitate private speech, not to promote a governmental message"). Therefore, San Antonio's decision to selectively subsidize a limited number of events could be permissible, as long as the City does not "discriminate invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas,'" *Regan*, 461 U.S. at 548 (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)), or "leverage its power

---

[19] The scope of San Antonio's involvement with the 60+ Mardi Gras Parade may be greater than its involvement with other processions, but San Antonio has not addressed this in its briefing.

to award subsidies . . . into a penalty on disfavored viewpoints." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).

We find that San Antonio is not engaging in content or viewpoint-based discrimination, at least not by waiving fees for the limited number of events under consideration in this case. Our recent decision in *Palmer ex rel. Palmer v. Waxahachie Independent School District* is instructive for our analysis. 579 F.3d 502 (5th Cir. 2009). In *Palmer*, we considered a school dress code that prohibited students from wearing shirts with messages, but had exemptions for shirts with "small logos" and "'principal approved' shirts that promoted school clubs, organizations, athletic teams, or 'school spirit.'" *Id*. at 509. Like the 2008 ordinance, the school policy in *Palmer* was a generally applicable policy that, due to certain exemptions, appeared on its face to treat protected speech differently on the basis of its content. Nevertheless, we concluded that "'the principal inquiry in determining content-neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" *Id*. at 510 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Therefore, since the school district "was in no way attempting to suppress any student's expression through its dress code," we found that the code was content-neutral. *Id*. Similarly, in this case, San Antonio's provision of financial support for certain processions does not demonstrate that it bears any animus against the viewpoints expressed by the plaintiffs in the International Women's Day Parade or other marches. San Antonio is not singling out disfavored viewpoints for sanction; instead, it is singling out a limited number of favored messages for special treatment. Under *Palmer*, this is permissible.[20]

---

[20] *Palmer* concerned the constitutionality of a school's dress code, a subject somewhat different than the one we confront today. This difference aside, our decision in *Palmer* rested on *Ward*, where the Supreme Court considered the permissibility of New York City's

No. 09-50692

We recognize that there is some Supreme Court precedent that arguably supports the plaintiffs' arguments concerning discrimination. For example, the Supreme Court has sometimes found statutes that grant preferential treatment to favored speakers, while equally burdening other speakers, to be content-based. *See Carey v. Brown*, 447 U.S. 455, 460-61 (1980) (striking down law that restricted all picketing in certain area, except labor-related picketing); *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972) (same). However, more recently, the Supreme Court has suggested that when municipalities grant waivers of permit requirements to certain speakers, our focus should be on whether the pattern of waivers reflects a desire to suppress disfavored viewpoints.[21] Furthermore, in the Supreme Court's cases discussing government subsidization of private speech, the Court has also focused on whether the government is using its subsidies as a means of singling out disfavored viewpoints for penalty.[22] In this context, we do not believe San Antonio is engaging in viewpoint discrimination by providing a benefit to a limited number of speakers.

---

regulation of speech in a public forum. 491 U.S. at 791. Thus, *Palmer* is relevant for this case.

[21] Specifically, in *Thomas v. Chicago Park District*, the Court stated that "[g]ranting waivers to favored speakers (or, *more precisely*, denying them to *disfavored* speakers) would . . . be unconstitutional." 534 U.S. at 325 (emphasis added). San Antonio does not treat the plaintiffs as disfavored speakers by providing a benefit to a select number of processions.

[22] *See Ysursa v. Pocatello Educ. Ass'n*, 129 S. Ct. 1093, 1098 (2009) (upholding state's ban on using payroll deductions for political purposes because prohibition was not "'aimed at the suppression of dangerous ideas'" (quoting *Regan*, 461 U.S. at 548) (internal brackets removed)); *Velazquez*, 531 U.S. at 547 (striking down program subsidizing legal services that had effect of suppressing "ideas thought inimical to the Government's own interest"); *Finley*, 524 U.S. at 587 (upholding government's selective subsidization of art, but leaving door open for as-applied challenge if government "leverage[d] its power to award subsidies . . . into a penalty on disfavored viewpoints"); *Rosenberger*, 515 U.S. at 822-23 (striking down university's singling out of religious student publications for non-subsidization, despite commitment to fund broad range of other student publications); *Regan*, 461 U.S. at 548 (upholding differential government subsidization of lobbying because government had not "discriminate[d] invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas'" (quoting *Cammarano*, 358 U.S. at 513)).

No. 09-50692

One might object to our reliance on the Supreme Court's subsidization case law in these circumstances, where San Antonio is imposing a financial burden on speakers attempting to access a public forum. To the best of our knowledge, none of the Supreme Court's cases concerning subsidization have directly involved public fora. Also, the Court has at times justified its support for selective subsidization by explaining that "'although government may not place obstacles in the path of a person's exercise of freedom of speech, it need not remove those not of its own creation.'" *Regan*, 461 U.S. at 549-50 (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980) (internal brackets and ellipsis omitted)). In this case, San Antonio's traffic control fees are an "obstacle" that the plaintiffs must surpass before exercising their speech rights; thus, one might argue that the City may not intervene to selectively subsidize payment of these fees for certain speakers.

However, in our view, public fora need not be a subsidy-free zone. When a municipality imposes reasonable user fees controlling access to public fora, it does not lose its ability to provide financial support for community events held in its public fora. For example, if San Antonio were to provide a block grant to Fiesta San Antonio in recognition of its positive effect on San Antonio's economy, and Fiesta's organizers were to use that grant to pay fees due under the 2008 ordinance, surely this would be an acceptable use of public funds. Simply put, we will not "engage in hair-splitting by finding a constitutional difference between waiving a fee and paying it out of the City treasury." *See Sullivan v. City of Augusta*, 406 F. Supp. 2d 92, 113 (D. Me. 2005), *aff'd in pertinent part*, 511 F.3d 16, 32 n.7 (1st Cir. 2007). As such, we join with the First and Sixth

Circuits, which have also endorsed municipal subsidization of events held on public streets.[23]

Of course, even if San Antonio may subsidize events held on its streets, it still may not engage in viewpoint discrimination in its provision of subsidies. *Velazquez*, 531 U.S. at 542. Thus, while we affirm San Antonio's waiver of fees for a limited number of events, we stress that the City's power in this area is not limitless. As noted above, there is disturbing evidence in the record concerning the City's practices under the 1988 ordinance, but these are not the facts before us on this facial challenge to the 2008 ordinance.

## V.

The plaintiffs next argue that the 2008 ordinance grants unconstitutionally excessive discretion to San Antonio's City Council and the SAPD to waive and assess traffic control fees. First, we address whether the City Council retains unconstitutional discretion to waive fees, and then we review whether the 2008 ordinance and Procedure 214 provide sufficient guidance to the SAPD in assessing fees. We find that the Council does not retain unconstitutional discretion and that the discretion of the SAPD is sufficiently cabined.

## A.

The plaintiffs argue that the 2008 ordinance impermissibly vests discretion in the City Council to waive traffic control fees, without also providing standards to guide the Council's exercise of that discretion. They rely primarily on the Supreme Court's decision in *Shuttlesworth v. City of Birmingham*, 394

---

[23] *See Sullivan*, 511 F.3d at 32 n.7; *aff'g in pertinent part* 406 F. Supp. 2d at 113 (holding that city had "not maintained or administered [its] Parade Ordinance to disfavor or suppress one viewpoint in favor of another" by financially supporting annual police association's parade); *Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1138 (6th Cir. 1991) (holding that city may differentially sponsor certain parades, as "the First Amendment guarantee of freedom of speech does not mean that the government must provide funds for or sponsor all speech equally").

U.S. 147 (1969), and the Ninth Circuit's recent decision in *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009). We find that the Council does not have unconstitutional discretion to waive fees under the 2008 ordinance. Although the City Council retains permissible legislative discretion to grant new reoccurring fee waivers, it has not reserved the right to meddle in the permit process on an application-by-application basis under the 2008 ordinance.

In *Shuttlesworth*, the Supreme Court considered the constitutionality of a parade ordinance that granted considerable power to a city commission—an entity akin to a city council—to grant or deny parade permits. Specifically, the ordinance provided that the commission would "grant a written permit" for a parade, "unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require[d] that [the permit] be refused." *Id*. at 149-50. The Supreme Court struck the ordinance down for granting "virtually unbridled and absolute power" to the city commission to prohibit parades. *Id*. at 150. The Court explained that the ordinance operated as a prior restraint, making "the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official," who could use his or her discretion to engage in censorship. *Id*. at 151 (quoting *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958)).

More recently, in *Long Beach*, the Ninth Circuit struck down an ordinance that imposed permit and service fees on march organizers but allowed a city council to waive them. 574 F.3d at 1042. Under the ordinance, march organizers could write to the city council after their march and request a waiver of applicable fees. *Id*. at 1017-18. Relying on *Shuttlesworth*, the Ninth Circuit held that "in the First Amendment context, where a legislative body has enacted a permitting scheme for expressive conduct but has reserved some decisionmaking authority for itself under that scheme, that reserved authority

is vulnerable to challenge on grounds of unbridled discretion." *Id*. at 1042. Since the defendant city had not pointed to any "provision of the Ordinance, or to any implementing regulation, that guide[d] the City Council's decision whether to fund or waive fees and charges," the court struck down the ordinance. *Id*. at 1043.

The plaintiffs argue that, as in *Long Beach*, San Antonio's City Council retains discretion to waive traffic control fees for particular events, unconstrained by any guidelines. The 2008 ordinance does not explicitly grant authority to the City Council to waive fees for any events beyond the three listed in section 19-636(d). Nevertheless, the plaintiffs argue that the City Council retains power under the procession ordinance to waive fees for additional groups. There are several indications in the record that the City Council does retain such authority. First, as noted above, when the Council passed the present ordinance, it did so with the understanding that its preexisting fee waivers for Fiesta San Antonio and the Cesar Chavez Parade would continue under the new ordinance.[24] Thus, San Antonio's present procession ordinance does not limit fee waivers to events expressly listed in the ordinance. Second, during the preliminary injunction hearings in this case, counsel for San Antonio represented to the district court that under the current procession ordinance, "there is nothing that would preclude [groups] from coming forward and seeking Council support and seeking an ordinance, if they have a specific event, and seeking to see if they would garner" support for a fee waiver from the Council.

We believe that the fee waivers condemned by the Ninth Circuit in *Long Beach* are distinguishable from those under consideration on this facial

---

[24] As already noted, before enacting the present ordinance, the Council reviewed a presentation that explained that "[o]ther ordinances already provide that the city will cover the costs associated with . . . Fiesta Parades and related events [and the] Cesar Chavez March."

challenge. In *Long Beach*, although the Ninth Circuit held that city councils may not exercise unguided discretion in making specific permit decisions, the court also noted that city councils may still exercise "the general discretion . . . to enact (or not enact) laws." *Id*. at 1042. In our view, the waivers under consideration in this case more closely resemble an exercise of the City Council's legislative authority than a specific licensing decision. San Antonio grants prospective, reoccurring fee exemptions for annual events, and the 2008 ordinance reserves no explicit authority for the City Council to waive fees on an application-by-application basis. In contrast, in *Long Beach*, the challenged ordinance specifically reserved waiver power for the city council, allowing event organizers to write to the council, requesting one-time waivers for particular events. *Id*. at 1017-18, 1042. Thus, in this case, San Antonio's City Council has not retained a role for itself in the permit application process;[25] it has instead prospectively exempted certain annual events from paying fees under its permit scheme. Although the City Council may in the future consider creating additional reoccurring exemptions for other events, this would be a permissible exercise of the Council's legislative authority, as long as the Council does not exempt so many events to create concerns about viewpoint discrimination, as discussed above. However, if the City Council in the future begins waiving fees for procession organizers on an ad hoc, application-by-application basis under the 2008 ordinance,[26] we can assess this in an as-applied challenge.[27]

---

[25] The City Council does retain authority to hear appeals from denials of permits by the SAPD. *See* Ch. 19, art. XVII, § 19-635. However, these appeals do not concern any refusals by the SAPD to waive fees, as the procession ordinance does not grant the SAPD authority to waive fees.

[26] As previously noted, it appears that under the 1988 ordinance, Council members sometimes intervened with the SAPD to obtain fee waivers for particular events. For the 2007 and 2008 versions of the current ordinance, we have no evidence of similar practices. During the brief period when the SAPD assessed fees after the repeal of the 1988 ordinance, no fee waivers were granted, other than for the Martin Luther King March. Then, from February

No. 09-50692

B.

The plaintiffs also contend that the 2008 ordinance and Procedure 214 do not sufficiently cabin the discretion of the SAPD in assessing traffic control and cleanup fees. The Supreme Court has held that "'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide . . . licensing authority.'" *Forsyth County*, 505 U.S. at 131 (quoting *Shuttlesworth*, 395 U.S. at 150-51). In our view, the standards guiding the SAPD are constitutional, as they do not grant arbitrary power to assess fees, but rather provide the police with limited discretion to allocate necessary traffic control and cleanup resources.

Before proceeding with our analysis, we review the standards by which the SAPD calculates fees for procession organizers. As explained above, the 2008 ordinance establishes that "[e]ach permit holder is responsible for" the cost of "[c]leaning up the procession route" and providing "traffic control personnel" and "traffic control devices for the procession route." Ch. 19, art. XVII, § 19-636(b). In determining "the number of peace officers and traffic control devices reasonably necessary to control traffic in the area of the requested procession," *id*. § 19-636(c), the procession ordinance directs the SAPD to consider:

> (1) The route and the identification of roadways that cross through or feed into the street of the proposed route;

2008 until March 2009, San Antonio was under an injunction that interfered with its ability to assess fees on procession organizers.

[27] The plaintiffs might object that we are requiring them to wait for the City Council to employ its discretion to waive fees in an impermissible manner. It is true that "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision." *Forsyth County*, 505 U.S. at 133 n.10. As such, when an ordinance clearly grants unguided discretion to an actor, a plaintiff can attack that ordinance without pointing to any particular impermissible exercises of discretion, as it is "the pervasive threat inherent in [discretion's] very existence that constitutes the danger to freedom of discussion." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). However, San Antonio cannot be sued simply because its City Council retains unconstrained *legislative* discretion. Such discretion is the very nature of legislative authority.

27

No. 09-50692

(2) The number of anticipated participants and vehicles in the event;
(3) Identification of other roadways, or public transportation and emergency vehicle routes that may be affected by the event;
(4) Length of the route and the identification of the number of intersections along the route that will require barricades or traffic control personnel;
(5) Whether intersections must be individually barricaded or whether officers can be assigned to move along with the event;
(6) The date and time of the event;
(7) Volume of vehicular and pedestrian traffic typical on and along the route for the time of day, day of the week and time of year for the proposed route.

*Id*. Once the SAPD determines the required number of personnel and barricades, it calculates fees on the basis of the City's collective bargaining agreement and the City's contract with a third party barricade vendor. *Id*.

Procedure 214 provides additional guidance for the implementation of the permit scheme. It supplies a list of factors to consider in determining the number of traffic control personnel and devices necessary for a procession, complementing the factors listed in the ordinance.[28] It also lists five possible arrangements for providing traffic control. For the smallest processions, it recommends not stopping vehicular traffic at all, instead separating marchers

---

[28] The procedure requires the SAPD to consider:

The proposed route including the size and type of roadway and the number of traffic lanes necessary to accommodate the procession; [t]he anticipated number of participants and vehicles in the procession; [t]he estimated number of traffic control personnel needed to staff traffic control points along the procession route and any necessary detour routes to ensure the safe, efficient and orderly flow of pedestrian and vehicular traffic affected by the procession; [t]he estimated number of barricades, traffic cones, barrels and traffic control signs necessary to comply with the Texas Manual of Uniform Traffic Control Devices to ensure the safety of the participants and motorists and to establish road and driveway closures and detour routes; [i]f other roadways or public transportation and emergency vehicle routes may be affected by the procession; [w]hether intersections must be individually barricaded or whether traffic control personnel can be assigned to move along with the procession; and [t]he volume of vehicular and pedestrian traffic typical on and along the route for the time of day, day of the week and time of year for the proposed route.
Procedure No. 214 at 4-5 (internal numbering removed).

28

from regular traffic with cars leading and following the procession. *See* Procedure No. 214 at 5, 12. For the largest processions, it recommends closing multiple lanes and blocking cross traffic along the procession route. *See id*. at 7-8, 11.

The plaintiffs assert that these standards are riddled with lacunae, leaving the SAPD with excessive discretion in allocating resources for processions. The plaintiffs argue that the 2008 ordinance and Procedure 214 do not clearly direct the SAPD on how to apply the lists of resource allocation factors. They complain that when the SAPD determines the resources necessary for a procession, it must consider factors not explicitly listed in the 2008 ordinance or Procedure 214, such as how much time a procession will remain on the streets. They protest that the 2008 ordinance and Procedure 214 do not clearly establish when barricades are necessary for a procession. They argue that the 2008 ordinance does not explain how cleanup costs should be assessed. They complain that the possible traffic control arrangements listed in Procedure 214 do not provide sufficient guidance to the SAPD, as processions with similar numbers of marchers could fit into multiple categories. Ultimately, attacks like these must fail, for the plaintiffs overestimate the precision demanded by the Constitution in these circumstances. While "'narrow, objective, and definite standards'" must guide an official's exercise of discretion, *Forsyth County*, 505 U.S. at 131 (quoting *Shuttlesworth*, 395 U.S. at 150-51), standards are not impermissible simply because they leave officials with some discretion. A review of relevant case law confirms this.

To be sure, when ordinances grant officials authority to assess fees on speech, some forms of discretion are constitutionally impermissible. Generally, ordinances that grant officials discretion to impose or waive fees at will are unconstitutional. For example, in *Forsyth County*, the Supreme Court struck down an ordinance interpreted to allow county officials freedom to adjust fees for

event organizers, irrespective of the actual "administrative and security expenses" borne by the county. *Id*. at 131 & n.9. Also problematic are ordinances that provide vague criteria for assessing fees, unanchored in determining the scope of fees necessary to reimburse a municipality for its expenses. Thus, in *Transportation Alternatives, Inc. v. City of New York*, the Second Circuit invalidated an ordinance that directed city officials to consider a range of factors in imposing fees on event organizers, including "whether the applicant will impose an admission charge," "whether the event is a charitable event," "whether the event is held for the purpose of raising funds," "the amount and nature of advertising, including whether the event has title sponsorship," and "such other information as the [Parks] Commissioner shall deem relevant." 340 F.3d 72, 75 (2d Cir. 2003).

However, when the police make decisions concerning the resources necessary to maintain order on city streets, they necessarily must exercise some discretion. As such, in *Sullivan v. City of Augusta*, the First Circuit upheld an ordinance that imposed fees on parade organizers to cover "the costs of traffic control per city collective bargaining agreement and clean up costs, as estimated by the Police Department." 511 F.3d at 22. The ordinance did not provide further guidance to the police, but the First Circuit explained that there was value in letting the police exercise their "[e]xperienced, professional judgment" in determining the resources necessary for traffic control, since the court found it "hard to see any purely mechanical means for determining how many officers would be needed to direct traffic at the various intersections of differing routes and neighborhoods." *Id*. at 36. Indeed, the Supreme Court has recognized that permit schemes must have some play in them, since overly rigid standards and requirements could actually suppress speech in some circumstances. *See Thomas*, 534 U.S. at 325. In this context, for example, if the SAPD's discretion were too limited, it could lead to tailoring concerns, as rigid standards might

result in unnecessary traffic control resources being devoted to particular processions, in turn leading to the imposition of excessive fees.

Viewed in the context of these cases, the 2008 ordinance is not constitutionally infirm. Like the ordinance in *Sullivan*, the 2008 ordinance and Procedure 214 grant the SAPD discretion to determine the resources necessary for cleanup and traffic control. The 2008 ordinance actually cabins police discretion *more* than the ordinance upheld in *Sullivan*. On the other hand, unlike the ordinance struck down in *Forsyth County*, the 2008 ordinance does not allow fees to diverge from the amount needed to reimburse San Antonio for necessary traffic control and cleanup services.[29] Instead, the 2008 ordinance provides that "[e]ach permit holder *is* responsible for" traffic control and cleanup expenses, with the SAPD only granted limited discretion to determine what *resources* should be allocated for particular events. Ch. 19, art. XVII, § 19-636(b) (emphasis added). Also, unlike the ordinance invalidated in *Transportation Alternatives*, all the factors listed in the 2008 ordinance and Procedure 214 relate to determining the personnel and equipment necessary to control traffic at processions. While the SAPD may at times need to consider certain traffic control factors beyond those explicitly listed, it is clear that the SAPD is limited

---

[29] With two exceptions. First, as already explained, the City grants a $3,000 subsidy to all "First Amendment" processions. *See* Ch. 19, art. XVII, § 19-636(c). As noted above, the plaintiffs brought vagueness and overbreadth challenges against this provision in the district court, but chose not to pursue them on appeal. Second, there could also be some variance is when extra personnel or barricades would be necessary to maintain order at processions whose participants are expressing controversial messages. Consistent with *Forsyth County*, the 2008 ordinance provides that "[a]ny additional costs for police personnel deemed necessary to provide security due to the nature of the event will not be assessed to the permit holder." Ch. 19, art. XVII, § 19-636(c). As explained above, in 2008, the City Council amended the new procession ordinance to ensure that the SAPD does not assess fees to recoup the expense of protecting speakers whose views are unpopular. *See Forsyth County*, 505 U.S. at 134-35 (holding that "[s]peech cannot be financially burdened . . . because it might offend a hostile mob"). The plaintiffs assert that this language does not do enough to prevent the SAPD from passing on security-related expenses to procession organizers. We find it sufficient, at least on the basis of the limited record before us on this facial challenge, with no evidence concerning its application to actual processions.

to assessing traffic control fees based on its calculation of "the number of peace officers and traffic control devices reasonably necessary to control traffic in the area of the requested procession." *Id*. § 19-636(c).

In short, the Constitution does not demand that policing decisions be made exclusively by reference to the equivalent of actuary tables and abacuses, simply because the cost of police activities are passed on to individuals engaging in expression protected under the First Amendment. However, we stress the limited record before us in this case. We lack any evidence concerning the enforcement of the standards in the 2008 ordinance and Procedure 214, as they came into effect after the International Women's Day March took place. If in the future we were presented with evidence that the SAPD used its discretion under the 2008 ordinance and Procedure 214 to charge drastically different fees for similar processions,[30] we might reach a different conclusion. *Cf. Forsyth County*, 505 U.S. at 132 (considering enforcement history of ordinance in determining whether it vested officials with excessive discretion).

## VI.

We now address whether San Antonio's 2008 ordinance is a permissible regulation of the time, place, and manner of speech. We have already concluded that San Antonio's selective subsidization of certain events does not undermine the overall content and viewpoint neutrality of the ordinance. Therefore, we now address whether the ordinance is "narrowly tailored to serve a significant

---

[30] The plaintiffs have pointed to some evidence showing that under the 1988 ordinance, the SAPD did at times assess considerably different fees for similar events. In particular, the plaintiffs note that in 2006, the SAPD produced fee estimates of $9,091 and $3,305 for apparently similar permit applications. This evidence, however, does not assist us in determining whether the 2008 ordinance and Procedure 214 provide sufficient direction to the SAPD in resource allocation and fee assessment. The 1988 ordinance did not contain standards guiding the discretion of the SAPD in allocating traffic control resources. It also did not prohibit the assessment of fees on the basis of providing security for marchers with controversial messages. *See* Ordinance 101404; Ordinance 86615; Ordinance 66526.

governmental interest" and "leave[s] open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130.

A.

The plaintiffs assert that San Antonio's selective fee waivers deprive the 2008 ordinance of the narrow tailoring necessary to sustain its constitutionality.[31] It is undisputed that San Antonio has a significant interest in recouping the expenses it incurs from the processions held on its streets. *See Thomas*, 534 U.S. at 322 (suggesting that municipalities may permissibly impose permit requirements designed "to assure financial accountability for damage caused by [an] event"); *Cox*, 312 U.S. at 577 (approving of license fee imposed on parade organizers to reimburse city for expenses caused by parade). Still, if in achieving this interest, "'a substantial portion of [the ordinance's] burden on speech does not serve to advance'" this goal, "then the ordinance is not narrowly tailored." *Knowles*, 462 F.3d at 434 (quoting *Ward*, 491 U.S. at 799). We find that San Antonio's fee exemptions for certain processions do not fatally undermine the tailoring of the 2008 ordinance. San Antonio may permissibly recoup some of its traffic control expenses, while simultaneously subsidizing certain events.

---

[31] In addition to this fee waiver argument, the plaintiffs assert in their briefing that San Antonio has not otherwise met its burden of demonstrating narrowly tailoring, suggesting that there may be other reasons why the 2008 ordinance is not narrowly tailored. They provide no support for this claim. While San Antonio does bear the burden of showing narrow tailoring, *see Hays County Guardian*, 969 F.2d at 118, this does not relieve the plaintiffs of their obligation as appellants to raise arguments explaining why the district court's grant of summary judgment to San Antonio was erroneous. *See* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . [an] argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Since the plaintiffs have not adequately briefed any narrow tailoring issues other than its argument concerning San Antonio's fee waivers, these other possible issues are waived. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument."). Therefore, we do not address whether the 2008 ordinance is narrowly tailored in the sense that it prevents the SAPD from charging excessive fees for the provision of unnecessary traffic control and cleanup resources.

No. 09-50692

In a number of cases, we have held that exemptions can render unconstitutional a regulation of speech that would otherwise be permissible. As noted above, in *Knowles v. City of Waco*, we recently struck down a city's parade ordinance that granted blanket permit exemptions to government agencies, funeral processions, and groups of students under the supervision of school authorities. 462 F.3d at 436. In reaching this result, we relied on our earlier decision in *Beckerman v. City of Tupelo*, where we struck down an ordinance with similar exemptions, reasoning that "'[b]ecause the City [was] so willing to disregard the traffic problems' that could be caused by" the exempted groups, we "could not 'accept the contention that traffic control [was] a substantial interest' that justified [the City's] parade permitting scheme." *Id*. at 436-37 (quoting 664 F.2d 502, 513 (5th Cir. 1981)). By analogy, San Antonio's fee waivers could be viewed as equally unacceptable, in that they undermine San Antonio's contention that recouping its traffic control expenses is so important that it must assess fees.

Relatedly, the plaintiffs complain that San Antonio's fee exemptions are impermissible because their effect is that the City only recovers a fraction of its traffic control expenses. The Supreme Court has held that fees on speech must have some relationship to solving the problems that supposedly justify their imposition. Thus, in *Cox v. New Hampshire*, the Supreme Court approved of a fee that reimbursed a city for the expenses caused by a parade, 312 U.S. at 577, while in *Murdock v. Pennsylvania*, the Court struck down a flat fee imposed on door-to-door solicitors, as it was not "calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." 319 U.S. 105, 116 (1943); *see also Fernandes v. Limmer*, 663 F.2d 619, 632-33 (5th Cir. 1981) (striking down flat $6 fee imposed on permit applicants, where defendant had not "demonstrate[d] a link between the fee and the costs of the licensing process").

34

Consistent with this precedent, in *Horton v. City of Houston*, we found that a public access television station's fee imposed on non-local broadcasters might not be narrowly tailored. Specifically, we expressed concern that there was a "lack of correlation between the amount charged to non-locally produced programs and [the station's] stated justification for imposing [its] fee." 179 F.3d 188, 195 (5th Cir. 1999). The station charged a $75 to $100 fee on non-local broadcasters and used this revenue to encourage local broadcasting by "train[ing] local producers, purchas[ing] production equipment, and fund[ing its] general operations." *Id.* We found that there was no evidence of whether the fee actually helped cover the cost of the station's operations and suggested that the fee should be struck down if it failed "to make any realistic dent in the costs borne by cable subscribers for the production facilities." *Id.* at 196. Thus, if San Antonio's imposition of fees is ineffective at recouping the City's traffic control expenses, these fees could be constitutionally suspect.

Initially, we note again the limited evidence before us. Although we know that San Antonio waives fees for a limited number of events, we lack evidence of how the SAPD has assessed fees under the standards in the 2008 ordinance and Procedure 214. Therefore, we do not know the exact percentage of San Antonio's traffic control expenses that it recovers under the 2008 ordinance. Nevertheless, there is no doubt that the City incurs considerable expense in supporting its exempted events, at least some of which are large processions that require extensive traffic control resources. For example, the cost of traffic control personnel for the 2008 Martin Luther King March appears to have been over $40,000, while expenses for certain Fiesta-related events in 2008 rose as high as $170,000. Another relevant consideration is that the City waives the first $3,000 of traffic control personnel expenses for every "First Amendment" procession, *see* Ch. 19, art. XVII, § 19-636(c), further reducing the amount by which its traffic control fees actually cover the expenses borne by the City. Thus,

even on the limited record before us, it is clear that there is not a perfect fit between the fees paid by procession organizers and the expenses incurred by the City.

Despite this less than perfect fit, we do not believe the fee exemptions and $3,000 credit for "First Amendment" processions fatally undermines the City's assessment of traffic control fees. San Antonio need not recoup *all* of its traffic control expenses for its fees to be narrowly tailored. Notably, in *Horton*, we suggested that the defendant public access station only needed to show that its fees for non-local broadcasters made a "realistic dent" in defraying its operating costs. 179 F.3d at 196. In this case, San Antonio makes a "realistic dent" in its budget by protecting itself from having to bear unexpectedly high traffic control expenses for all the various marches and parades that may be held throughout a year. In effect, San Antonio is insuring its annual budget against the unexpected, and we conclude this is permissible.

Similarly, San Antonio's selective subsidization of certain processions also does not render its fees poorly tailored. San Antonio has imposed a generally applicable fee on procession organizers, but has also decided to provide financial support to particular events in the form of fee waivers. As already explained, these waivers are the equivalent of paying funds "out of the City treasury." *See Sullivan*, 406 F. Supp. 2d at 113. In our view, the City Council's decision to appropriate funds to particular uses cannot undermine the tailoring of San Antonio's overall fee scheme. We find that *Knowles*, where we struck down a parade ordinance with a limited number of exemptions, 462 F.3d at 436-37, is inapposite in this context, given our conclusion that San Antonio may permissibly subsidize activities in public fora.

Finally, this is not a case like *Murdock*, where solicitors had to pay fees that bore no relation to the burdens their activity imposed. 319 U.S. at 116. Instead, in this case, fees are clearly linked to the expense of "[c]leaning up the

procession route" and the cost of any "personnel" and "devices" needed for traffic control. *See* Ch. 19, art. XVII, § 19-636(b). Given these considerations, we find that San Antonio's fee exemptions do not undermine the tailoring of the 2008 ordinance.

## B.

The plaintiffs' final argument is that the alternatives for expression in San Antonio that are unburdened by fees are inadequate. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984). We find that the 2008 ordinance provides the plaintiffs with sufficient alternatives for expression unburdened by fees. There are procession routes in San Antonio where large groups can march without paying traffic control fees. Also, although the procession ordinance may limit the plaintiffs' ability to hold marches along certain expensive routes, it does not limit other methods of expression along these routes.

The plaintiffs argue that San Antonio lacks alternative fora for unburdened expression because its sidewalks and parks are effectively not available for large processions. A number of our sister circuits have held that when municipalities impose fees on groups organizing street processions, sidewalks and parks provide sufficient alternative venues for expression, at least when groups may access them for free. *See Sullivan*, 511 F.3d at 43; *Stonewall*, 931 F.2d at 1134. However, the plaintiffs assert that in San Antonio, these venues would not be free for large events like the International Women's Day

March.[32] The plaintiffs have also presented evidence demonstrating that many San Antonio sidewalks are not accessible for disabled individuals.

Despite these problems concerning parks and sidewalks, we find that the fees imposed under the 2008 ordinance do not deprive large groups of adequate alternatives for expression. The 2008 ordinance waives the first $3,000 in traffic control fees for all "First Amendment" processions, *see* Ch. 19, art. XVII, § 19-636(c), and the plaintiffs do not dispute the City's contention that there are procession routes that could be used for free.[33] Thus, large groups need not hold marches on sidewalks or rallies in parks, where their disabled members may not be able to participate.

It may be that the free procession routes are not the plaintiffs' preferred routes and that fewer individuals would be exposed to the plaintiffs' messages along these routes. However, an alternative venue for speech may still be constitutionally adequate, even when there is "a reduction in the potential audience" for speech in the alternative venue. *Sullivan*, 511 F.3d at 44. Furthermore, although courts have at times struck down ordinances "that push protestors far away from their intended audience," *see Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1225 (10th Cir. 2007), on this

[32] As noted above, the procession ordinance exempts sidewalk marches and stationary assemblies from its reach. Ch. 19, art. XVII, § 19-632. However, if a sidewalk march "impede[s] the normal flow or regulation of pedestrian or vehicular traffic," individuals must obtain a procession permit and pay attendant fees. *Id.* Also, San Antonio imposes "usage" and "[d]amage/cleanup" fees for "special events" held "within city parks." *See* San Antonio, Tex., Code ch. 22, art. I, § 22-17(b) (2010). For nonprofit organizations, these fees could range from $750 to $1,800, depending on the size of the event. *Id.* § 22-17(b)(3), (c).

[33] We note that the $3,000 subsidy does not cover cleanup expenses. However, we find that the imposition of cleanup fees does not strip these otherwise free procession routes of their status as available alternatives for unburdened expression. While procession organizers cannot avoid disrupting traffic, they should be able to conduct a procession in such a way as to avoid the imposition of cleanup fees. If this is not the case for certain groups, we can review this in a future as-applied challenge.

No. 09-50692

facial challenge, the plaintiffs have not claimed a need to access any particular audience or procession route in San Antonio.

We also note that even if groups could not hold a large procession along their intended route, the 2008 ordinance does not burden other forms of expression along that route. In *Members of City Council of Los Angeles v. Taxpayers for Vincent*, the Supreme Court upheld a ban on posting signage on public property, explaining that the challenged ordinance did "not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited." 466 U.S. at 812; *see also Kovacs v. Cooper*, 336 U.S. 77, 89 (1949) (plurality opinion) (upholding ban on use of sound trucks on public streets since ordinance did not burden other means of expression in same area). Similarly, in this case, the 2008 ordinance assesses no fees on small groups picketing unobtrusively, handing out leaflets, or engaging passersby in conversation. Given these considerations, we conclude that the 2008 ordinance provides ample alternatives for unburdened expression, even for groups that cannot afford the expense of traffic control fees along certain routes.

## VII.

We therefore reject the plaintiffs' facial challenges to the 2008 ordinance. If future problems arise concerning its implementation, the plaintiffs are of course free to bring a new as-applied challenge to the ordinance. On the basis of the record before us, however, we must AFFIRM the district court's grant of summary judgment in favor of San Antonio.