**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONTANA MEDICAL
ASSOCIATION; FIVE VALLEYS
UROLOGY, PLLC; PROVIDENCE
HEALTH & SERVICES -
MONTANA; WESTERN
MONTANA CLINIC, PC; PAT
APPLEBY; MARK CARPENTER;
DIANA JO PAGE; WALLACE L.
PAGE; CHEYENNE SMITH,

     *Plaintiffs-Appellees*,

MONTANA NURSES
ASSOCIATION,

     *Intervenor-Plaintiff-
Appellee*,

  v.

AUSTIN KNUDSEN, Montana
Attorney General; LAURIE ESAU,
Montana Commissioner of Labor and
Industry,

     *Defendants-Appellants*.

No. 23-35014

D.C. No. 9:21-cv-
00108-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted February 8, 2024
Portland, Oregon

Filed October 9, 2024

Before:  M. Margaret McKeown, Jay S. Bybee, and Daniel
A. Bress, Circuit Judges.

Opinion by Judge Bress;
Concurrence by Judge McKeown

## SUMMARY[*]

### Vaccinations / Preemption

The panel (1) reversed the district court's decision that Montana House Bill 702 (HB 702), which prohibits discrimination based on vaccination status, is preempted by the Americans with Disabilities Act (ADA) and the Occupational Health and Safety Act (OSH Act) and violates the Fourteenth Amendment's Equal Protection Clause; and (2) vacated in full the district court's permanent injunction enjoining enforcement of HB 702 in health care settings.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Plaintiffs are health care providers and several Montana residents with compromised immune systems who sought to invalidate HB 702 in all health care settings.  They alleged that the ADA and the OSH Act impliedly preempt HB 702 because the statutes require employers to know employee vaccination status and to discriminate on that basis in order to furnish ADA accommodations for persons with immunocompromising disabilities and to satisfy the OSH Act's duty to furnish a workplace free of recognized hazards.  Plaintiffs further alleged that HB 702 violates the Equal Protection Clauses of the United States and Montana Constitutions by irrationally subjecting different types of health-related facilities to differing rules.

The panel held that because plaintiffs sought to enjoin HB 702 across all health care settings, plaintiffs' preemption and Equal Protection theories were properly analyzed as facial challenges.  The panel held that neither the ADA nor the OSH Act's general duty clause facially preempts HB 702 in health care settings.  Plaintiffs had not demonstrated that HB 702 creates a genuine conflict with the ADA in any specific case, much less that HB 702 is facially invalid in all health care settings.  The district court's broad findings showed at most only the existence of a perceived conflict that was too speculative on these facts to justify preemption.  Nor did the record support an injunction in the case of any specific plaintiff.  The panel reserved judgment on whether, in a future case, the ADA and the OSH Act's general duty clause could preempt HB 702 on a narrower, as-applied basis.

The panel held that the Equal Protection Clause does not facially invalidate HB 702 in health care settings because the classification and differential treatment of facilities could rationally reflect Montana's interest in balancing personal

privacy interests and public health by exempting facilities that the State believes pose different risks.

Concurring, Judge McKeown wrote separately to address the standards for facial preemption and to encourage the Ninth Circuit to join the majority of its sister circuits in articulating the proper standard. Under such a standard, courts must analyze the potential conflict between state and federal law based on the general principles of preemption. If there is a conflict, the scope of the remedy must be tailored to the scope of the conflict. If the scope of the conflict is broad enough, then a facial remedy may be proper, but courts must not facially strike down a state law with a "plainly legitimate sweep." In this case, Judge McKeown agreed with the majority that plaintiffs had not shown enough to justify facial preemption, even under the lower "plainly legitimate sweep" standard.

## COUNSEL

Kathryn S. Mahe (argued) Justin K. Cole, Garlington Lohn & Robinson PLLP, Missoula, Montana; Raph Graybill, Graybill Law Firm PC, Great Falls, Montana; for Plaintiffs-Appellees.

Brent A. Mead (argued), Deputy Solicitor General; Michael D. Russell, Assistant Attorney General; Christian B. Corrigan, Solicitor General; Austin Knudsen, Montana Attorney General; Office of the Montana Attorney General, Montana Department of Justice, Helena, Montana; for Defendants-Appellants.

Elise K. Yarnell and David Tryon, Hahn Loeser & Parks, Columbus, Ohio, for Amicus Curiae The Buckeye Institute.

Leonard A. Nelson, American Medical Association, Chicago, Illinois, for Amicus Curiae American Medical Association.

**OPINION**

BRESS, Circuit Judge:

In 2021, the Montana Legislature enacted House Bill 702 (HB 702) to prohibit discrimination based on vaccination status. The district court below held that two federal laws, the Americans with Disabilities Act (ADA) and the Occupational Health and Safety Act (OSH Act), impliedly preempt HB 702. The court further held that HB 702 violates the Fourteenth Amendment's Equal Protection Clause because it fails rational basis review. For these reasons, the district court permanently enjoined the enforcement of HB 702 in health care settings.

We hold that the ADA, the OSH Act, and the Equal Protection Clause do not facially invalidate HB 702 in health care settings. We reverse the district court's decision and vacate its injunction.

I

A

HB 702 amended the Montana Human Rights Act to prohibit discrimination based on vaccination or immunity status. Prompted by COVID-19 but not limited to COVID

vaccinations, HB 702 makes it "an unlawful discriminatory practice for:"

> (a) a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;
>
> (b) an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or
>
> (c) a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

Mont. Code Ann. § 49-2-312(1).

State law defines an "[i]mmunity passport" as "a document, digital record, or software application indicating that a person is immune to a disease, either through vaccination or infection and recovery." *Id.* § 49-2-312(5)(a). "'Vaccination status' means an indication of whether a person has received one or more doses of a vaccine." *Id.* § 49-2-312(5)(b).

HB 702 includes some carve-outs.  The first makes clear that an employer does not commit unlawful discrimination by "recommend[ing] that an employee receive a vaccine." *Id.* § 49-2-312(3)(a).  More germane to this lawsuit, a second exception provides that a "health care facility" "does not unlawfully discriminate" if it:

> (i) asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

> (ii) implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

*Id.* § 49-2-312(3)(b).

This second exception thus allows a "health care facility" to ask about employee vaccination status, to infer lack of

vaccination from an employee's non-answer, and to then provide reasonable accommodations to protect the health and safety of employees, patients, and others. *Id.* A separate provision defines "health care facility" as one that is used "to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual," including:

> chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

*Id.* § 50-5-101(26)(a) (2021). But "health care facility" does not include "offices of private physicians [and] dentists," among others. *Id.* § 50-5-101(26)(b) (2021).[1]

Finally, HB 702 contains a third carve-out for a separate class of facilities: "A licensed nursing home, long-term care facility, or assisted living facility is exempt from compliance with 49-2-312 during any period of time that compliance with 49-2-312 would result in a violation of regulations or

---

[1] This provision was amended during the pendency of this case, but without materially changing the language relevant to this appeal. *See* Mont. Code Ann. § 50-5-101(20)(a). For consistency, this opinion refers to the 2021 versions of the statute.

guidance issued by [Centers for Medicare and Medicaid Services (CMS) or the Centers for Disease Control and Prevention]." *Id.* § 49-2-313.

Violators of HB 702 can be required to rectify any harm caused by their illegal discrimination. *Id.* § 49-2-506. They can also be subject to civil suits, *id.* § 49-2-512(3), and criminal penalties, *id.* § 49-2-601.

B

This lawsuit aimed to invalidate HB 702 in all health care settings. The plaintiffs are a hospital system, two offices of private physicians, a medical association, and several Montana residents with compromised immune systems who are allegedly "qualified individuals with a disability" under the ADA. A union for Montana nurses also intervened as a plaintiff, alleging injury to its members.

Plaintiffs are primarily concerned about unvaccinated health care workers infecting coworkers and patients, especially those who are immunocompromised. They maintain that HB 702 increases this risk by preventing the employers of Montana health care providers from knowing health care employees' vaccination status.

To that end, plaintiffs claimed that the ADA and the OSH Act preempted HB 702. Plaintiffs' ADA preemption theory is that in health care settings, the ADA requires employers to know employee vaccination status and to discriminate on the basis of this status in order to furnish ADA accommodations for persons with immunocompromising disabilities, including patients and other employees. Plaintiffs' OSH Act preemption theory is premised on the similar belief that health care employers must have either vaccinated employees or knowledge of

their employees' vaccination status to satisfy their OSH Act duty to furnish a workplace free of recognized hazards.

Plaintiffs also alleged that HB 702 violated the Equal Protection Clauses of the United States and Montana Constitutions.   Plaintiffs maintained that, in imposing different requirements on different types of health care facilities through its series of carve-outs, HB 702 created "unreasonable and baseless" distinctions because the facilities often employ the same providers, treat the same patients, and have the same interest in preventing infection.

Plaintiffs sought to enjoin enforcement of HB 702 in all health care settings.  After a bench trial, the district court granted plaintiffs' requested relief.  The State of Montana appealed.  We review the district court's legal rulings, including its preemption determinations, de novo.  *See MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1117 (9th Cir. 2020).

## II

The district court first held that the ADA preempts HB 702 in health care settings because ADA compliance requires knowledge of health care workers' vaccination status and discrimination based on employees' lack of vaccination.  We disagree.  The ADA does not facially preempt HB 702 in health care settings.

## A

Preemption follows from the constitutional directive that the laws of the United States are the "supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2. If state laws conflict with federal law, they are preempted and of no effect.  *See, e.g.*, *Mut. Pharm. Co. v. Bartlett*, 570

U.S. 472, 479–80 (2013); *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022).

Plaintiffs do not argue that the ADA expressly preempts HB 702, but that it does so impliedly. They claim that, in health care settings, HB 702 conflicts with the ADA. For preemption purposes, such a conflict exists "where it is impossible for a private party to comply with both state and federal law," known as impossibility preemption, or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as obstacle preemption. *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).

To show impossibility preemption, plaintiffs must establish that it is "impossible for a private party to comply with both state and federal requirements." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). The "existence of a hypothetical or potential conflict" is "insufficient." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). That is, "the conflict must be an actual conflict, not merely a hypothetical or potential conflict." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009). Although this does not foreclose challenges based on future or anticipated conflicts, it does mean that "speculative" conflicts are not sufficient. *Id.* at 866. Thus, for impossibility preemption, the record must fairly support "an irreconcilable conflict" between federal and state law. *Rice*, 458 U.S. at 659.

Under the doctrine of obstacle preemption, a state law is preempted if it "undermines the intended purpose and 'natural effect' of the federal law." *Crosby*, 530 U.S. at 373.

We determine whether the state law creates a "sufficient 'obstacle' to give rise to implied preemption" by looking to "the federal statute as a whole and identifying its purpose and intended effects." *Atay*, 842 F.3d at 699. And when "a statute regulates a field traditionally occupied by states, such as health [and] safety," as is the case here, "a 'presumption against preemption' adheres." *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). In the obstacle preemption context, we thus "assume that a federal law does not preempt the state's police powers absent a 'clear and manifest purpose of Congress.'" *Id.* (quoting *Wyeth*, 555 U.S at 565).

Finally, because plaintiffs seek to enjoin HB 702 across all health care settings—which "implicate[s] the enforcement of the law against third parties"—plaintiffs' ADA preemption theory is properly analyzed as a facial challenge. *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)). We therefore proceed with caution because facial challenges "often rest on speculation" and "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). To prevail, plaintiffs "must establish that no set of circumstances exists under which [HB 702] would be valid" in health care settings. *United States v. Salerno*, 481 U.S. 739, 745 (1987). As we have explained, although "[t]he Supreme Court and this court have called into question the continuing validity of the *Salerno* rule in the context of First Amendment challenges," "[i]n cases involving federal preemption of a local statute, however, the rule applies with full force." *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en banc); *see*

*also, e.g.*, *Am. Apparel & Footwear Assoc., Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024) ("The *Salerno* rule applies to a federal preemption facial challenge to a state statute."); *id.* at 933 ("[T]he *Salerno* standard applies to conflict preemption.").

B

The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). In the employment context (Title I), discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* at § 12112(b)(5)(A); *see also Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (discussing discrimination under Title I).

A public accommodation violates the ADA (Title III) when it fails

> to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the

> nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). Public accommodations are defined to include the "professional office of a health care provider" and hospitals. *Id.* § 12181(7)(F).

Under both Titles I and III of the ADA, an entity is only liable for failing to make reasonable accommodations or modifications. *See Snapp*, 889 F.3d at 1095; *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004). Whether an accommodation is reasonable "involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Id.* (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995)).

The district court held that ADA compliance in health care settings requires employers to know health care workers' vaccination status and to discriminate based on employees' lack of vaccination. As the court reasoned, "[d]eprived by law of the ability to require vaccination or immunity status of an employee, a health care employer is not able to properly consider possible reasonable accommodations if an employee asks to limit his or her exposure to unvaccinated individuals." The district court thus concluded the State was "unable to meaningfully demonstrate how employers can accommodate a disabled person or employee and still comply with" HB 702.

The district court made several broad findings in support of its preemption determination. The court discussed the importance of vaccines in "creating a safe and effective

health care environment." It further found that health care employers had immunocompromised patients and staff who were disabled within the meaning of the ADA and who wanted other health care workers to be vaccinated. And the court cited testimony about the risk that unvaccinated health care employees may pose to "vulnerable and immunocompromised patients" on account of "the high risk of serious injury due to infection." Based on these findings, the district court reasoned that HB 702 conflicted with the ADA: health care facilities needed to know employee vaccination status and to discriminate based on that status to make ADA-required accommodations for immunocompromised disabled persons.

We conclude that the district court's high-level findings show at most only "the existence of a hypothetical or potential conflict" between the ADA and HB 702, *Rice*, 458 U.S. at 659, that is, a perceived conflict that is too speculative on these facts to justify preemption. Plaintiffs have not demonstrated that HB 702 creates a genuine conflict with the ADA in any specific case, much less that HB 702 is facially invalid in all health care settings. *See Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007) ("We find preemption only in 'those situations where conflicts will necessarily arise.'" (quoting *Goldstein v. California*, 412 U.S. 546, 554 (1973))). The district court's generalized factual findings about the importance of vaccines do not show an "irreconcilable conflict" between HB 702 and the ADA or that HB 702 stands as an obstacle to the objectives of the ADA, whether facially or in any specific case. *Rice*, 458 U.S. at 659.

As we have discussed, the ADA requires health care facilities to make "reasonable accommodations" for qualifying disabled employees, absent "undue hardship" to

the employer, 42 U.S.C. § 12112(b)(5)(A), as well as "reasonable modifications in policies, practices, or procedures" when "necessary" to afford their services to individuals with disabilities.  *Id.* § 12182(b)(2)(A)(ii). Determining the scope of the duties to make "reasonable" accommodations and modifications requires reference to the particular situation of the potential ADA plaintiff: "Because the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might" be necessary. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999); *see also, e.g.*, *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910–11 (9th Cir. 2013) (same); *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (same).

But the evidence presented at trial—about the general importance of vaccines and the general health risks posed by unvaccinated workers—does not demonstrate anything more than that "in a hypothetical situation a private party's compliance with" HB 702 "might cause [it] to violate the" ADA, which is insufficient to show a preemption-producing conflict between the two laws. *Rice*, 458 U.S. at 659.  We lack information about specific plaintiffs, specific health care settings, and other available accommodations that could satisfy the ADA's requirements with respect to any particular disabled person.  On this record, plaintiffs have not shown that a specific accommodation or modification involving knowledge of employee vaccination status or discrimination based on vaccination status would be reasonable or necessary in any or all health care settings.

We find instructive the Fifth Circuit's decision in *E.T. v. Paxton*, 19 F.4th 760 (5th Cir. 2021).  In *E.T.*, the plaintiffs

claimed that the ADA preempted a Texas law prohibiting mask mandates in schools because a school's failure to have a mask mandate would deny plaintiffs a quality education based on their disabilities. *Id.* at 763–64. But as the Fifth Circuit explained, "plaintiffs are not entitled to their preferred accommodation, but only a reasonable accommodation." *Id.* at 767. "Given the availability of vaccines, voluntary masking, and other possible accommodations—options barely acknowledged by either plaintiffs or the district court—the record before us likely does not support the conclusion that a mask mandate would be both necessary and obvious under the ADA . . . ." *Id.* at 768 (emphasis omitted). The state law thus did not "render[] it a 'physical impossibility' for schools to comply with the ADA," nor would the state law "'disturb, interfere with, or seriously compromise the purposes of'" the ADA. *Id.* (quoting *City of Morgan City v. S. La. Elec. Coop. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994)).

A similar analysis applies here. Like in *E.T.*, the plaintiffs' ADA claim "rests on the faulty premise that the *only* accommodation available to plaintiffs" requires employer knowledge of employee vaccination status and discrimination based on that status. *Id.* In accepting this premise, the district court below made no apparent findings about whether the requested accommodation would be necessary to accommodate any specific ADA claimants, let alone all ADA-protected persons in health care settings. Nor did the district court properly consider whether ADA beneficiaries could be reasonably accommodated in ways that do not violate HB 702, such as through uniform PPE requirements, testing measures, appropriate alternative work arrangements, and so on. *See id.* at 768 (noting that "voluntary masking" could be an alternative accommodation

to a mask mandate); *see also E.T. v. Paxton*, 41 F.4th 709, 718 (5th Cir. 2022) ("It is plainly within the State's power to remove one possible accommodation from consideration, so long as other reasonable options remain."). The district court also did not sufficiently address whether the plaintiffs' desired accommodations were reasonable, whether in any specific case or in all potential cases arising from health care settings. *See Fortyune*, 364 F.3d at 1083 (noting that the reasonableness of an accommodation can turn on the cost of implementation). In the absence of a record more particularized to specific plaintiffs and specific medical facilities, it cannot be said that a health care employer's inability to discriminate based on employees' lack of vaccination would lead to ADA violations in any or all cases, so as to warrant facially invalidating HB 702 in health care settings.

We additionally note that while not dispositive, the lack of any apparent past ADA claim involving HB 702 highlights the hypothetical, speculative nature of the alleged conflict between the two laws. The record reflects that at least some of the plaintiff health care institutions did not require employees to be vaccinated or have pre-HB 702 policies that would have allowed employers to know their employees' vaccination histories. And yet the record lacks a concrete indication that these health care facilities encountered specific requests for reasonable ADA accommodations from particular patients or others relating to the vaccination status of employees. To the extent that patients and others have inquired about the vaccination status of those working at health care facilities, the record lacks sufficient information as to the nature of these requests, whether they were reasonable, and how they might have been accommodated through other means. Similarly,

although the district court indicated that one patient plaintiff, Ms. Page, requested to see only vaccinated health care providers, this finding is contradicted by other testimony from Ms. Page. The absence of any developed record specific to a particular putative ADA plaintiff falls short of the "fact-specific, individualized analysis" that the ADA requires, *Wong*, 192 F.3d at 818, which in turn would inform the preemption analysis.

That the district court's injunction is overbroad is also underscored by the fact that the injunction extends even to health care settings exempted from HB 702, such as hospitals. *See* Mont. Code Ann. § 49-2-312(3)(b). These exempted facilities may (1) "ask[] an employee to volunteer the employee's vaccination or immunization status," (2) "consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status," and (3) use that information to "implement[] reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases." *Id.*

The district court reasoned that even exempted facilities would remain unable to comply with the ADA because "the exception only protects those who are not vaccinated or immune" and "does not allow for accommodations to be made for persons who have a disability, as is required under the [ADA]." But § 49-2-312(3)(b) allows a "health care facility" to ask employees about their vaccination status and, based on their responses, to "implement reasonable accommodation measures" to protect the safety and health of all persons—whether "employees, patients, visitors, and other persons." That includes hypothetical ADA plaintiffs

whose theoretical claims provide the asserted basis for preemption.  The exceptions in § 49-2-312(3)(b) further demonstrate that the district court's permanent injunction as to all health care settings is overbroad.

Because the record reflects at most only a hypothetical or potential conflict between federal and state law, *Rice*, 458 U.S. at 659, we hold that the ADA does not facially preempt HB 702 in health care settings.  Nor does the record support an injunction in the case of any specific plaintiff.  We note, however, that our decision does not foreclose future as-applied ADA preemption challenges or affirmative defenses to HB 702 enforcement, based upon a proper showing.

### III

The district court also held that the OSH Act impliedly preempts HB 702 in health care settings.  That determination is likewise incorrect.

The Secretary of Labor has responsibility for enforcing the OSH Act, but she has delegated much of her relevant statutory responsibilities to the Occupational Safety and Health Administration (OSHA).  *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 92 (1992) (plurality). "The OSH Act requires that every employer provide a workplace that is 'free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees' (the 'general duty' clause) and 'comply with occupational safety and health standards promulgated' by [OSHA]."  *Flower World, Inc. v. Sacks*, 43 F.4th 1224, 1226–27 (9th Cir. 2022) (quoting 29 U.S.C. § 654(a)).

No OSHA standard governs the vaccinations with which HB 702 is concerned.  Although plaintiffs argued below that HB 702 conflicts with certain OSHA regulations on

bloodborne pathogens, the district court rejected this argument, and plaintiffs do not contest this ruling.  Nor do plaintiffs identify any other OSHA regulation with which HB 702 could conflict.  Indeed, although OSHA initially promulgated a rule requiring COVID-19 vaccination mandates for most employers with at least 100 employees, the Supreme Court held that the agency lacked the authority to do so.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 115, 119–20 (2022) (per curiam).

Notwithstanding the absence of any governing OSHA regulation, the district court held that HB 702 conflicted with the OSH Act's general duty clause.  As referenced above, that provision requires employers to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."  29 U.S.C. § 654(a)(1).  The district court referenced testimony from one former state medical official that "vaccines are necessary and important in health care settings to limit or prevent the spread of disease."  The district court further found that "vaccine-preventable diseases constitute recognized hazards in the workplace."  From this the court concluded that:

> [H]ealth care settings cannot comply with both the federal general duty clause [in the OSH Act] to keep the workplace 'free from recognized hazards' and [HB 702], because the Montana statute removes an essential tool from the health care provider's toolbox to

> stop or minimize the risk of spreading vaccine-preventable disease.

The court thus held that "the general duty clause of the [OSH] Act preempts" HB 702.

We disagree. Even assuming the OSH Act's general duty clause could impliedly preempt state laws such as HB 702, the district court's broad injunction cannot stand. To make out a violation of the general duty clause, the Secretary of Labor "must prove that (1) the employer failed to render its workplace free of a hazard which was (2) recognized and (3) causing or likely to cause death or serious injury." *Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981) (quoting *Titanium Metals Corp. of Am. v. Usery*, 579 F.3d 536, 540 (9th Cir. 1978)). Proving the first element requires the Secretary to "specify the specific steps an employer should have taken to avoid the citation and demonstrate their feasibility." *Id.*

Considering the general duty clause under the implied preemption framework, plaintiffs had to establish that a health care entity would violate the OSH Act in complying with HB 702 or that HB 702 stands as an obstacle to Congress's "clear and manifest purpose" in the OSH Act's general duty clause. *See Wyeth*, 555 U.S at 565. And plaintiffs would need to make this showing as to all health care settings to prevail on their facial challenge. *See, e.g.*, *Salerno*, 481 U.S. at 745.

At a minimum, we conclude that the district court's OSH Act preemption analysis is infirm for substantially the same reason as the court's ADA holding: the district court's findings at most support a "hypothetical or potential conflict" between the OSH Act and HB 702, which is

"insufficient." *Rice*, 458 U.S. at 659. Whether HB 702 prevents employers from providing employment "free from recognized hazards that are causing or are likely to cause death or serious physical harm to . . . employees," 29 U.S.C. § 654(a)(1), requires a more specific understanding in any given case about the nature of the employer, the workplace, the diseases in question, the risks they pose, the availability and feasibility of other methods of preventing the transfer of vaccine-preventable diseases, and so on. *Cf. Donovan*, 645 F.2d at 829; *see also Fabi Const. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007) ("[T]he Secretary must prove that a reasonably prudent employer familiar with the circumstances of the industry would have protected against the hazard in the manner specified by the Secretary's citation." (quoting *L.R. Willson & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*, 698 F.2d 507, 513 (D.C. Cir. 1983))).

The trial record in this case addresses these issues at too high a level of generality to support a finding of preemption as to any specific employer, much less all employers in health care settings. Indeed, and perhaps tellingly, neither the plaintiffs nor the district court identify any case holding that the general duty clause impliedly preempts state law, let alone one enjoining the enforcement of a state law as to an entire industry. *Cf. Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1205–07 (10th Cir. 2009) (holding that the general duty clause did not preempt a state law relating to firearm storage at places of employment because "OSHA is aware of the controversy surrounding firearms in the workplace and has consciously decided not to adopt a standard" (emphasis omitted)). And particularly in the face of a presumption against preemption, *see Wyeth*, 555 U.S. at 565 n.3, we are hard-pressed to endorse an expansive preemption

theory under which health care entities may have been routinely violating the OSH Act by employing infection control policies different than those plaintiffs prefer.

For these reasons, the record does not support the district court's conclusion that the OSH Act's general duty clause preempts HB 702 in all health care settings. As in the case of the ADA, we reserve judgment on whether, in a future case, the general duty clause could preempt HB 702 on a narrower, as-applied basis.

IV

The plaintiffs further argue, and the district court agreed, that HB 702 violates the Equal Protection Clauses of the United States and Montana Constitutions by irrationally subjecting different types of health-related facilities to differing rules. We hold that HB 702 survives rational basis review.

To prevail on a Fourteenth Amendment Equal Protection Clause claim, a plaintiff "must show 'that a class that is similarly situated has been treated disparately.'" *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (quoting *Christian Gospel Church, Inc. v. City & Cnty. of S.F.*, 896 F.2d 1221, 1225 (9th Cir. 1990)). Then, a court must determine whether the challenged governmental classification satisfies the appropriate level of constitutional scrutiny. *Id.* at 968. The parties agree that our equal protection analysis is the same under both the federal and Montana constitutions. *Cf. McDermott v. Mont. Dep't of Corr.*, 29 P.3d 992, 998–99 (Mont. 2001).

The plaintiffs focus on the fact that through its regime of exemptions, HB 702 imposes different rules for three categories of health-related facilities. First, licensed nursing

homes, long-term care facilities, and assisted living facilities are exempt from HB 702 to the extent necessary to comply with CMS and CDC guidelines.  Mont. Code Ann. § 49-2-313.  Second, facilities defined as "health care facilities"—including hospitals—are exempt from HB 702, insofar as they may ask employees to volunteer their vaccination status, infer a lack of vaccination status from employees' unwillingness to provide this information, and implement reasonable accommodations to protect the safety of employees, patients, and others.  *Id.* §§ 49-2-312(3)(b); 50-5-101(26)(a) (2021).  Third, and finally, other health care settings that are not defined as "health care facilities," such as private physician offices, are permitted neither exemption.

It is questionable whether the facility classes are similarly situated.  But even assuming they are, HB 702 does not violate the Equal Protection Clause.  Because HB 702's treatment of health care settings does not implicate a "fundamental right" or operate "to the peculiar disadvantage of a suspect class," rational basis review applies.  *See Raidoo v. Moylan*, 75 F.4th 1115, 1125 (9th Cir. 2023) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)).

In *Olson v. California*, 104 F.4th 66 (9th Cir. 2024) (en banc), our en banc court recently confirmed the extremely difficult task that awaits anyone who would challenge a legislative distinction as irrationally drawn.  In *Olson*, we rejected the plaintiffs' claim that a California law violated the Equal Protection Clause by treating certain app-based work arrangements in the transportation and delivery service industry different from other app-based work arrangements.  *Id.* at 71–72.  We assumed for purposes of our decision that the two classes were similarly situated but concluded that the

"Equal Protection claim nevertheless fail[ed]" because California had "rational reasons"—"stemming the erosion of the middle class, and reducing income inequality"—for any disparate treatment. *Id.* at 77–78.

As we explained in *Olson*, the rational basis standard "ask[s] whether 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* at 77 (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993)). "We need not rely on the legislature to proffer its actual rationale motivating the legislation—or any rationale, for that matter." *Id.* at 78 (citing *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)). And a state has "no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). Instead, the classification "may be based on rational speculation unsupported by evidence or empirical data." *Id.* (quoting *Beach Commc'ns*, 508 U.S. at 315). Plaintiffs have the burden to "negate 'every conceivable basis' which might justify" the classification. *Olson*, 104 F.4th at 71 (quoting *Beach Commc'ns*, 508 U.S. at 314–15). Given this high burden, it is "no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

HB 702 easily satisfies rational basis review. The classification and differential treatment of facilities could rationally reflect Montana's interest in balancing personal privacy interests and public health by exempting facilities that the State believes pose different risks. Montana could rationally conclude that its interest in outlawing discrimination based on vaccination status was less compelling in different types of facilities that provide different forms of care or that present greater risks for the

spread of infectious diseases.  Montana was not required to conclude that HB 702 should operate identically in private doctors' offices, hospitals, and nursing homes.

The district court's conclusion that HB 702's distinctions are irrational seemingly rested on its mistaken belief that the State needed to "prove" or "convincingly argue" that HB 702 is "related to health and safety."  Longstanding case law makes clear that Montana did not need to provide "evidence or empirical data" or like justifications for the precise contours of the classifications it drew.  *Beach Commc'ns*, 508 U.S. at 315.  And it is irrelevant whether the State "actually articulate[d]" a sufficient rationale for its law. *Nordlinger*, 505 U.S. at 15.  The district court thus erred in holding that HB 702's classification scheme lacked any rational basis.

V

Finally, we deem moot the portion of the district court's order enjoining the enforcement of HB 702 to the extent it conflicted with interim CMS regulations requiring COVID-19 vaccinations in health care facilities.  *See* 86 Fed. Reg. 61,555 (Nov. 5, 2021).  The district court enjoined HB 702 "for so long as the" CMS regulations remained effect.  These regulations have since been rescinded.  *See* 88 Fed. Reg. 36,485, 36,488 (June 5, 2023).

As to those regulations, the district court's order is thus no longer in effect, by its own terms.  The expiration of the interim CMS regulations also moots any preemption claim based on those regulations.  *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950); *NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007).

                              *     *     *

HB 702 is not facially invalid as to health care settings under the ADA, OSH Act, or Equal Protection Clause.  We vacate the district court's injunction in full.

   **REVERSED; VACATED.**

---

**McKEOWN, Circuit Judge, concurring:**

I write separately to address the standards for facial preemption. The majority appropriately relies on two Supreme Court cases that, if taken at face value, erect an insurmountable bar for litigants: *United States v. Salerno*, 481 U.S. 739 (1987), and *Rice v. Normal Williams Co.*, 458 U.S. 654 (1982). The challenge is to interpret and reconcile these cases in a practical way that remains faithful to the Supreme Court's teachings. Courts are rightly concerned with hastily striking down a state law in its entirety. And yet, facial preemption persists for good reason. *See City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) ("[T]he Court has allowed such challenges to proceed under a diverse array of constitutional provisions."). Our circuit's articulation of the facial preemption standards has engendered confusion in this murky, but important area of law. I write in the hope of clarifying the principles at stake and with the wish that our circuit will ultimately join the majority of circuits on these issues.

### I.   *United States v. Salerno*

The first standard comes from *United States v. Salerno*. In *Salerno*, the Supreme Court declared that, in a facial challenge, "the challenger must establish that no set of circumstances exists under which the [state statute] would

be valid.'" 481 U.S. at 745. This standard, which is widely criticized, has fractured the circuits and raises too high a bar for litigants attempting to vindicate federal rights. In my view, we ought to make explicit what the Court has done implicitly: bid the *Salerno* standard goodbye.

Decades ago, Justice Stevens wrote in a concurrence, "I do not believe the Court has ever actually applied such a strict standard, even in *Salerno* itself, and the Court does not appear to apply *Salerno* here." *Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring). Ten years later, Justice Thomas, writing for the Court, acknowledged, "While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Glucksberg*, 521 U.S. at 740 (Stevens, J., concurring)). Since then, the Court generally presents the *Salerno* "no set of circumstances" standard alongside the *Washington State Grange* "plainly legitimate sweep" standard. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) ("[A] plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" (first quoting *Salerno*, 481 U.S. at 745, and then quoting *Wash. State Grange*, 552 U.S. at 449)); *United States v. Stevens*, 559 U.S. 460, 472 (2010) (same); *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (same). *But see United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

The Court has even acknowledged that following *Salerno* to its logical end can lead to an absurd result. In *City of Los Angeles v. Patel*, the plaintiffs challenged a provision

of the municipal code that "compels 'every operator of a hotel to keep a record' containing specified information concerning guests and to make this record 'available to any officer of the Los Angeles Police Department for inspection' on demand." 576 U.S. 409, 412 (2015) (quoting Los Angeles Municipal Code §§ 41.49(2), (3)(a), (4) (2015)). The city, citing *Salerno*, argued that the facial challenge "must fail because such searches will never be unconstitutional in all applications." *Id.* at 417. The city pointed to, for instance, situations where police are responding to an emergency—an established Fourth Amendment exception. *Id.* at 417–18. In response, the Supreme Court reasoned:

> While [the city] frames this argument as an objection to respondents' challenge in this case, its logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches. For this reason alone, the City's argument must fail: The Court's precedents demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed.

*Id.* In other words, although the city could come up with circumstances that pose no conflict between the municipal code provision and federal law, *Salerno* did not preclude the plaintiffs' facial argument. And so, the Court distanced itself from *Salerno* and affirmed the role of facial challenges.

In light of these mixed signals from the Court, the circuits have taken different approaches. Four circuits—the First, Second, Sixth, and Eighth Circuits—apply *Salerno*

alone;**[1]** the Fifth, Ninth, and D.C. Circuits have, with some exceptions, quietly followed the Supreme Court's lead in articulating the *Salerno* and *Washington State Grange* standards as alternatives;**[2]** and six circuits—the Third, Fourth, Seventh, Tenth, Eleventh, and Federal Circuits— have explicitly weakened or abandoned *Salerno*.**[3]** I

[1] *NCTA -- The Internet & Television Ass'n v. Frey*, 7 F.4th 1, 17 (1st Cir. 2021) (applying *Salerno*); *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (applying *Salerno* and rejecting arguments for a more relaxed standard under *Patel* and *Stevens*); *Worth v. Jacobson*, 108 F.4th 677, 685 (8th Cir. 2024) (applying *Salerno*). The Sixth Circuit has wavered between applying *Salerno* alone and presenting the alternative "plainly legitimate sweep" standard from *Washington State Grange*; but most recently, the Sixth Circuit set forth a very strict application of *Salerno*. *Compare Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (applying the alternative standards), *with L. W. v. Skrmetti*, 83 F.4th 460, 489–90 (6th Cir.) (applying *Salerno* strictly), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024).

[2] *Comm. on Ways & Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 339 (D.C. Cir. 2022) ("As recently as last year, the Supreme Court has confirmed that outside of the First Amendment context, 'a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the [law] would be valid . . . or show that the law lacks a plainly legitimate sweep.'" (cleaned up)); *In re Sealed Case*, 936 F.3d 582, 589 (D.C. Cir. 2019) (same); *Prison Legal News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022) (same); *McKinley v. Abbott*, 643 F.3d 403, 408 (5th Cir. 2011) (same); *Int'l Women's Day Mar. Plan. Comm. v. City of San Antonio*, 619 F.3d 346, 355 (5th Cir. 2010) (same). *But see Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 425 (5th Cir. 2024) (applying *Salerno*).

[3] *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013); *People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n*, 60 F.4th 815, 834 (4th Cir. 2023) ("As it appears, if courts have ever articulated a clear standard for facial challenges, it is not the

encourage the Ninth Circuit to join the majority of its sister circuits.

Our circuit initially acknowledged the controversy over *Salerno*, but "chose[] to continue applying *Salerno*" until instructed otherwise. *See Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016). Notably, more recently, we have presented the *Salerno* and *Washington State Grange* standards together. *NetChoice, LLC v. Bonta*, No. 23-2969, 2024 WL 3838423, at *7 (9th Cir. Aug. 16, 2024); *Italian Colors Rest.*, 878 F.3d 1165, 1175 (9th Cir. 2018) (same); *Prison Legal News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022) (same).

The *Salerno* critics have the better of the argument, supported by how the Supreme Court has actually addressed facial challenges. As the Third Circuit reasoned, "[the *Salerno*] approach would reject a conflict preemption claim in a facial challenge whenever a defendant can conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law." *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013). The court pointed out that the Supreme Court's then-most recent facial preemption precedents ignore *Salerno*, and indeed the Court's reasoning would make little sense if *Salerno* were still good law. *Id.* With even more force, the Tenth Circuit states, "The idea that the Supreme Court applies the 'no set of circumstances'

---

*Salerno* formulation, which has never been the decisive factor in any decision of the Court, including *Salerno* itself." (cleaned up)); *League of Women Voters of Indiana, Inc. v. Sullivan*, 5 F.4th 714, 728–29 (7th Cir. 2021); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123–24 (10th Cir. 2012); *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022); *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1337–38 (Fed. Cir. 2005).

test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012). The Tenth Circuit further highlighted that the "no set of circumstances" test "completely divorces review of the constitutionality of a statute from the terms of the statute itself, and instead improperly requires a court to engage in hypothetical musings about potentially valid *applications* of the statute." *Id.* at 1123.[4]

The majority of the circuits simply apply the relevant constitutional test in preemption cases—whether facial or as-applied. For instance, the Tenth Circuit asserts that "no one test" applies to all facial challenges. *Id.* at 1124. Rather, the Tenth Circuit simply applies the "appropriate constitutional framework" in analyzing the state statute at issue. The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.* (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)); *see Club Madonna*, 42 F.4th at 1256 (declining to apply *Salerno* and concluding that the ordinance at issue "fails the relevant constitutional test because, by requiring certain businesses to verify the employment eligibility of independent contractors and casual hires, it obstructs federal law").

---

[4] Scholarly work has also long questioned the propriety of the *Salerno* standard. *See, e.g.*, Michael Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 238 (1994) (asserting that the principle laid out by the Supreme Court in *Salerno* as a limit on facial challenges "is wrong" because "[i]t neither accurately reflects the Court's practice" nor is "consistent with a wide array of legal practices").

The Tenth Circuit's approach, also embraced by five other circuits, makes the most sense and is largely correct, though I would also include the Supreme Court's "plainly legitimate sweep" framework as a backstop. Courts must analyze the potential conflict between state and federal law based on the general principles of preemption. If there is a conflict, the scope of the remedy must be tailored to the scope of the conflict. If the scope of the conflict is broad enough, then a facial remedy may be proper, but courts must not facially strike down a state law with a "plainly legitimate sweep."

## II. *Rice v. Normal Williams Co.*

The majority also recites language from *Rice v. Normal Williams Co.*, noting that the "existence of a hypothetical or potential conflict" is "insufficient" for facial preemption. 458 U.S. at 659. The majority further adds that plaintiffs may show impossibility preemption based on future or anticipated conflicts, so long as those conflicts are not overly "speculative." But this clarification—contrasting between "hypothetical or potential" conflicts, deemed insufficient under *Rice*, and "future or anticipated" conflicts, which might pass muster with the majority—is a distinction without a difference that threatens to obfuscate more than clarify. Indeed, reliance on *Rice* is problematic for several reasons.

To begin, the language—"the existence of a hypothetical or potential conflict" is "insufficient"—creates a low bar, necessary but not sufficient to showing facial preemption. *Rice* stands for the uncontroversial proposition that a plaintiff cannot hang a facial preemption claim on "*a* hypothetical" conflict, that is, an isolated hypothetical conflict. Facial preemption, of course, requires more.

That is not to say that facial preemption is foreclosed just because the conflicts are not yet realized—i.e., hypothetical or potential. All facial challenges are, by definition, hypothetical or potential. In a facial challenge, plaintiffs must argue that the state law will generally conflict with a federal law in the future, justifying broad relief. These future conflicts, generally affecting scores of non-party actors, are necessarily hypothetical or potential.

Even more concerning, it is not clear that *Rice* remains good law. In *Rice*, the Supreme Court considered whether a California price fixing statute violated the Sherman Act. The Court's holding rested on a comparison between two prior cases. On the one hand, in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, the Court reasoned that facial preemption is appropriate when a state statute constitutes a per se violation of the Sherman Act. 445 U.S. 97, 102–03 (1980). On the other hand, in *Joseph E. Seagram & Sons v. Hostetter*, the Court held that pegging prices to a previous month's rate could violate the Sherman Act through economic pressures, but the conflict between the state statute and the Sherman Act was too hypothetical for facial preemption. 384 U.S. 35, 45 (1966). Thus, the Court in *Rice* drew a line based on these two divergent precedents. 458 U.S. at 660–61. It concluded that a "hypothetical or potential conflict" will not be sufficient for facial preemption but a per se violation will be. *Id.* at 659.

Had the Court left it there, then *Rice* would likely be part of an oft-recited standard for facial preemption. But it did not. Seven years later, the Court implicitly walked back its

analysis in *Rice* by overruling *Seagram*. In *Healy v. Beer Institute, Inc. (Healy II)*, the Court declared:

> [T]o the extent that *Seagram* holds that retrospective affirmation statutes do not facially violate the Commerce Clause, it is no longer good law. . . . By tying maximum future prices in one State to the lowest prices in other States as determined at a specified time in the past, retrospective affirmation laws control pricing decisions in nonaffirmation States by requiring that those decisions reflect not only local market conditions, but also market conditions in the affirmation States—market conditions that would be irrelevant absent the binding force of the affirmation statutes.

491 U.S. 324, 343 (1989). The Court then cited to "[r]ecent economic scholarship" on macroeconomic market theory to show the cause of effect of the state law. *Id.* at 343 n.15.

Thus, at the very least, the Supreme Court has backed off its most stringent facial preemption standard and undermined *Rice*'s conclusions. The Court has since cited the "hypothetical or potential" language in *Rice* sparingly. In the last 25 years, the Court has cited this language from *Rice* just once and did not rely on it to dismiss a facial preemption challenge. *See Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019). Rather, the Court in *Merck* merely elaborated on the standard of review for preemption—it is a question of law, not a question of fact. *Id.* Indeed, the Court has not relied on *Rice* to nix a facial preemption claim in decades, and it has never done so outside of the antitrust

context. Similarly, the Ninth Circuit has cited *Rice*'s "hypothetical or potential" language just once since *Healy II* and has never cited *Rice* outside of an antitrust context. *See Sanders v. Brown*, 504 F.3d 903, 910–11 (9th Cir. 2007).

Interpreting *Rice* post-*Healy II* requires some guesswork. Reading *Rice* and *Healy II* side-by-side, it is not clear that *Rice* remains good law—particularly given the dearth of citations in recent decades. But to the extent that *Rice* remains instructive, the Court's message seems to be that the conflict between state and federal law cannot be too attenuated, isolated, or uncertain.

## III.   HB 702

Although I ultimately conclude that Montana Medical has failed to carry its burden, aspects of this case expose the cracks in *Salerno* and *Rice*. Setting aside the nursing home exception in Section 49-2-313 and the healthcare facility exception in Section 49-2-312(3)(b), HB 702 makes it unlawful to discriminate against a person or change the conditions of employment based on the person's vaccination status. Mont. Code Ann. § 49-2-312(1). This means that a private pediatrician cannot ensure that her staff is vaccinated for measles before interacting with newborn patients;[5] a geriatric specialist cannot ensure influenza or shingles vaccinations; and an HIV clinic cannot ensure bacterial pneumonia vaccination. Examples abound. It is often the immunocompromised who have no choice but to seek medical care in, for instance, an oncologist office, a lupus

---

[5] The Center for Disease Control explains, "Measles is highly contagious. If one person has it, up to 9 out of 10 people nearby will become infected if they are not protected." *About Measles*, Center for Disease Control (May 23, 2024), https://www.cdc.gov/measles/about/index.html.

treatment center, or a diabetes specialist's office. Vaccines are a fundamental tool in accommodating individuals with disabilities—people who often interact more frequently with the healthcare system than others. Indeed, even a *juris* doctor can understand how medical providers' obligations under the ADA might differ depending on their patient populations and services.

Are there circumstances in which *not* discriminating or adjusting work conditions on the basis of vaccine status pose no problem under the ADA? Of course. But does HB 702 have a plainly legitimate sweep if it sets an unknowable number of environments on a crash course with the ADA? Perhaps not. The above examples are both hypothetical and also certainly impending. And so, neither the insurmountable *Salerno* standard nor the low *Rice* hurdle answers the question presented. But the general principles of preemption do.

To be sure, HB 702 is likely preempted in some circumstances, but it is Montana Medical's burden to justify the scope of the remedy sought. As the majority points out, "We lack information about specific plaintiffs, specific health care settings, and other available accommodations that could satisfy the ADA's requirements with respect to any particular disabled person." I agree. Put simply, Montana Medical has not shown enough to justify facial preemption, even under the lower "plainly legitimate sweep" standard. For these reasons, I concur.